[No. A125861. First Dist., Div. Two. June 18, 2010.]

RAYMOND GARDNER, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY, Respondent;
COUNTY OF CONTRA COSTA, Real Party in Interest.

## COUNSEL

Daniel A. Horowitz, under appointment by the Court of Appeal, for Petitioner.

Elias Batchelder for Habeas Corpus Resource Center as Amicus Curiae on behalf of Petitioner.

Robin Lipetzky, Acting Public Defender, and Jonathan Laba, Deputy Public Defender, for Public Defender of Contra Costa County as Amicus Curiae on behalf of Petitioner.

John T. Philipsborn for California Attorneys for Criminal Justice as Amicus Curiae on behalf of Petitioner.

Natasha Minsker for American Civil Liberties Union as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Sharon L. Anderson, County Counsel, Esther Milbury and Rebecca Hooley, Deputy County Counsel, for Real Party in Interest.

Robert J. Kochly, District Attorney, and Doug MacMaster, Deputy District Attorney, for District Attorney of Contra Costa County as Amicus Curiae on behalf of Real Party in Interest.

Edmund G. Brown, Jr., Attorney General, and Gerald A. Engler, Assistant Attorney General, upon the request of the Court of Appeal.

Oᴘɪɴɪᴏɴ

**RICHMAN, J.**—Penal Code section 987.9 (section 987.9) provides that in "the trial of a capital case . . . [an] indigent defendant . . . may request the court for funds for . . . investigators, experts, and others for the preparation . . . of the defense." Apparently for years, the Contra Costa County Superior Court entertained section 987.9 requests by indigent defendants charged in special circumstances murders even when the requests were made before the preliminary hearing. Petitioner Raymond Gardner, charged with special circumstances murder, moved in 2009 for section 987.9 funds, a request the court denied solely because the district attorney had not announced that he was seeking the death penalty and, until he did, petitioner's case was not "presently a capital case."

We conclude this was error, as a "capital case" as used in section 987.9 means one where the defendant faces the possibility of the death penalty, where the defendant "actually risks death." (*Sand v. Superior Court* (1983) 34 Cal.3d 567, 571 [194 Cal.Rptr. 480, 668 P.2d 787] (*Sand*).) So, unless the district attorney makes an announcement to the contrary, a defendant charged with murder with special circumstances is exposed to that punishment, and a section 987.9 request must be heard on the merits.

## BACKGROUND

On April 17, 2009, petitioner Raymond Gardner was charged with a violation of Penal Code section 187, subdivision (a),[1] for the willful, deliberate, and premeditated murder of Bruce King, with two "special circumstances," that the murder was committed during the commission or attempted commission of a robbery and burglary.[2] (§ 190.2, subd. (a)(1).) After arraignment but before the preliminary hearing, petitioner's counsel filed a motion entitled "Request for Investigative Funding (Capital Murder Case—Penal Code § 987.9)," requesting funds for a second counsel (under *Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108]), a paralegal, and an investigator.[3] The presiding judge of the Contra Costa

---

[1] All further statutory references are to the Penal Code.

[2] Petitioner was also charged with six other counts, none of which is relevant to this petition.

[3] We do not know the details of the request, as petitioner has provided only the motion's cover sheet, presumably to maintain its confidentiality. The content of such a request—indeed, the request itself—is confidential by statute. (See § 987.9, subd. (a) ["The fact that an application has been made shall be confidential and the contents of the application shall be confidential."].) In limited circumstances, the Attorney General is allowed access to the otherwise confidential application "when the defendant raises an issue on appeal or collateral review . . . [that] relates to the issue raised" in the section 987.9 application. (*Id.*, subd. (d).) This provision is not applicable here.

County Superior Court denied the motion without reaching the merits, concluding that section 987.9 did not apply because the "[d]efendant's case is not presently a capital case." Specifically, the court said, the prosecution had not made a "final determination" on whether to seek life without possibility of parole (LWOP) or the death penalty and, until such determination is made, petitioner "has an LWOP case."

Petitioner renewed his request, citing *Abernathy v. Superior Court* (2007) 157 Cal.App.4th 642 [68 Cal.Rptr.3d 726] (*Abernathy*). The superior court again denied the motion and petitioner filed a petition for writ of mandate. After receiving informal opposition from the Attorney General,[4] we issued an order to show cause and have received the briefing by the parties and, in addition, amicus curiae briefs from California Attorneys for Criminal Justice, the American Civil Liberties Union, Habeas Corpus Resource Center, and the Contra Costa County Public Defenders Office. We then heard oral argument.

## DISCUSSION

### 1. *The petition is moot, but we decide the issue anyway*

In the course of the briefing here petitioner was advised by the District Attorney of Contra Costa County that he would not seek the death penalty in this case. Because of this decision, real party in interest and the district attorney argue the petition is moot, relying on the California Supreme Court decision in *Sand, supra*, 34 Cal.3d 567, which specifically held that section 987.9 does not apply to a murder case in which the prosecution has stated it will not seek the death penalty. (*Sand, supra*, at pp. 571–572.)

As a general rule "[a] writ of mandate will not issue to enforce an abstract right, when the occurrence of an event subsequent to the commencement of the proceeding makes the issuance of the writ of no practical benefit to the petitioner." (*Clementine v. Board of Civ. Ser. Commrs.* (1941) 47 Cal.App.2d 112, 114 [117 P.2d 369].) That general rule bends, however, when

---

[4] The petition named the People of the State of California as the real party in interest and at different times the Attorney General and the district attorney have appeared as real party in interest. However, in his informal reply the Attorney General acknowledged that "[t]he People, real party in this matter, do not have an overriding interest in the outcome of this writ proceeding since the issue primarily concerns not the merits of the underlying criminal prosecution, but whether petitioner is entitled to funds from the public fisc." On December 23, 2009, we replaced the People as real party in interest with the County of Contra Costa, because section 987.9 funds are paid by it (see § 987.9, subd. (b)(1)), and thus it is the entity with a "direct interest" in the outcome of the proceeding. (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1233 [94 Cal.Rptr.2d 740] [standing requires that the party "obtain some benefit" or "suffer some detriment" from the decision; that "interest must be direct [citations], and it must be substantial."].)

the case presents an "important question affecting the public interest that is ' " 'capable of repetition, yet evading review.' " ' " (*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1190, fn. 6 [86 Cal.Rptr.2d 778, 980 P.2d 337]; see also *Peterson v. City of San Diego* (1983) 34 Cal.3d 225, 227 [193 Cal.Rptr. 533, 666 P.2d 975] [appellate courts have discretion to consider a case that is technically moot when the issues are of continuing public importance].) This aptly describes the situation here.

Before 2009, the policy of the Contra Costa County Superior Court was to rule on requests for section 987.9 funds on the merits, even when the funds were sought before the preliminary hearing. However, sometime in 2009 the presiding judge apparently instituted a new policy, to deny requests for ancillary funding made prior to an announcement that the district attorney would seek the death penalty. Since then at least two other petitions for mandate have been filed in this court arising from this policy: *Burris v. Superior Court* (Oct. 23, 2009, A126366) in Division Three, and *Miranda v. Superior Court* (Dec. 18, 2009, A127054) in Division Five, both of which petitions were denied. While *Miranda* was uneventful, with no petition for review filed after the denial. *Burris* was not. In that case, after Division Three denied the petition, the Supreme Court granted defendant's petition for review and transferred the case back to Division Three "with directions to vacate its order denying the writ of mandate and to issue an alternative writ."[5] Division Three issued the alternative writ and later dismissed the petition as moot when the superior court decided the motion on its merits and "granted funds pursuant to Penal Code section 987.9."

While the superior court complied with the alternative writ in *Burris*, it is far from clear that the issue has gone away: nothing in the record or anything said at oral argument indicates that the superior court has changed its policy. Absent such a policy reversal, the ancillary defense funding in every special circumstance case in Contra Costa County is affected. It is, in short, an important issue. And unquestionably one capable of repetition. And of evading review. The petition here was filed on August 25, 2009, more than a month before the petition in *Burris*, filed on October 9, 2009. Yet, *Burris* was able to wend its way through this court, up to the Supreme Court, get transferred back to this court, and then be rendered moot by the superior court—all before our case was even set for oral argument.

---

[5] This order directing issuance of an alternative writ "does not stand for the proposition that the Supreme Court has determined that petitioner was correct on the merits, or justified, but merely that extraordinary relief is the only adequate avenue for review." (*Bridgestone/Firestone, Inc. v. Superior Court* (1992) 7 Cal.App.4th 1384, 1389, fn. 4 [9 Cal.Rptr.2d 709].)

### 2. *The superior court must hear the request on the merits*

California law has long provided for imposition of the death penalty. The 1849 Constitution "recognize[d] the existence of capital punishment," a recognition carried over into the 1879 version. (*People v. Anderson* (1972) 6 Cal.3d 628, 638 [100 Cal.Rptr. 152, 493 P.2d 880].) A brief interruption occurred in early 1972, when our Supreme Court concluded "that capital punishment is impermissibly cruel," and held that the sections of the Penal Code providing for that punishment were, "accordingly, unconstitutional." (*Id.* at pp. 656–657.) In November of that year the voters amended the Constitution and reinstated the death penalty, which constitutional "amendment was intended to nullify *People v. Anderson.*" (3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 410, p. 546.) Thereafter "[a] new death penalty statute was enacted in 1977," which has since been upheld by the California Supreme Court. (*Ibid.*)

■ Section 987.9 was part of that 1977 statutory scheme, and provides in pertinent part that in "the trial of a capital case . . . the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense." (§ 987.9, subd. (a).) These funds are "to supplement preexisting provisions for employment of defense counsel at public expense by making provision for services ancillary to those of counsel." (*Keenan v. Superior Court, supra,* 31 Cal.3d at p. 430 (*Keenan*).) The Legislature provided for these extra funds presumably because imposition of the death penalty "is qualitatively different from a sentence of imprisonment." (*Woodson v. North Carolina* (1976) 428 U.S. 280, 305 [49 L.Ed.2d 944, 96 S.Ct. 2978].) "Because life is at stake, courts must be particularly sensitive to insure that every safeguard designed to guarantee defendant a full defense be observed." (*Keenan, supra,* 31 Cal.3d at p. 430.)

Against this background, the substantive question before us is straightforward: Does section 987.9 apply in a special circumstances murder case where the district attorney has not announced that he or she will seek the death penalty? The superior court answered in the negative and refused to hear the motion on the merits, primarily relying on *Sand, supra,* 34 Cal.3d 567. We read *Sand* otherwise, as supporting the conclusion that the superior court has to hear the request on the merits.

*Sand* is noteworthy as the leading case on eligibility for section 987.9 funding issues, but it dealt with the inverse of the situation here. There, the defense requested section 987.9 funding *after* the prosecution had elected *not* to seek the death penalty—in other words, in a setting where Sand was facing a maximum possible sentence of LWOP. The Supreme Court concluded that

because Sand "does not risk capital punishment, his is not a 'capital case' within the meaning of section 987.9." (*Sand, supra*, 34 Cal.3d at p. 572.)

The analysis leading to the conclusion in *Sand* began with the Supreme Court observing that "capital case" is ambiguous: it "might be understood either to define the nature of the offense charged—i.e., murder with special circumstances—or to describe the permissible punishment—i.e., that the death penalty may be imposed." (*Sand, supra*, 34 Cal.3d at p. 570.) Because of this "ambiguity," the court sought to "discern [the] legislative intent" behind section 987.9. (*Sand, supra*, 34 Cal.3d at p. 570.) That legislative history led the court to conclude that section 987.9 was not intended to apply to all special circumstance cases, but rather only those where the death penalty remained a possibility: "Nowhere [in the 1977 statutory scheme] is the term 'capital case' defined, and no distinction relevant for purposes of construing section 987.9 is made between death and life imprisonment without parole. However, because the ultimate purpose of the 1977 statute was to reinstate the death penalty, we may reasonably conclude that its companion section 987.9 was intended to insure that in cases in which the defendant actually risks death he or she will be afforded such ancillary defense services as are necessary to a 'complete and full defense.' " (*Sand*, at p. 571.)

Importantly, the court repeatedly used the term "actually risks death" or similar terms in describing a "capital case." For example, in discussing the history of section 987.9, the court observed that "the Legislature has expressed its intention that the defense services funding provision apply in those cases in which *death remains a possible punishment*." (*Sand, supra*, 34 Cal.3d at p. 571, italics added.) And in contrasting the provision to differently worded statutes, the court stated that "[s]ection 987.9, in contrast, provides for ancillary defense funds in 'capital cases' only—i.e., only when the death penalty *may* be imposed." (*Id.* at pp. 571–572, italics added.) The court also reviewed its prior decision in *Keenan*, where it "define[d] a 'capital case' as one in which the death penalty may be imposed: 'In a murder prosecution that is factually and legally complex, the task of effectively preparing for trial places a substantial burden on the defense attorney. This is particularly true of a *capital case*, since *the possibility of a death penalty* raises additional factual and legal issues.' " (*Sand, supra*, at p. 573.)[6]

Like the superior court, real party in interest here also relies on *People v. Ward* (2005) 36 Cal.4th 186 [30 Cal.Rptr.3d 464, 114 P.3d 717] (*Ward*). But

---

[6] *Williams v. Superior Court* (1983) 34 Cal.3d 584 [194 Cal.Rptr. 492, 668 P.2d 799], the companion case to *Sand*, is similar: a case involving "only life without the possibility of parole" is not a "capital case" under section 987.9. (34 Cal.3d at p. 587.)

*Ward* merely affirms *Sand*. Defendant Ward was charged with special circumstances, and a possible death penalty, because he allegedly committed multiple murders. When his motion to sever was granted, the court relieved his second *Keenan* counsel in the first murder case, for the killing of Stumpf. On appeal, Ward argued it was error to relieve the second counsel. The Supreme Court disagreed, as Ward no longer faced the death penalty: "[O]nce the court granted defendant's severance motion, the trial for the killing of Stumpf was no longer a capital case but simply a first degree murder prosecution. Indeed, following severance, defendant faced the specter of the death penalty only if he were convicted of the first or second degree murder of Stumpf. (See § 190.2, subd. (a)(2); cf. *Williams v. Superior Court* (1984) 36 Cal.3d 441, 454 [204 Cal.Rptr. 700, 683 P.2d 699].) As such, the court had no authority to maintain . . . second counsel . . . ." (*Williams*, at pp. 197–198.) *Ward* provides no support for the proposition that petitioner was not charged in a "capital case." Indeed, *Ward* seemingly recognizes the limitation of *Sand*, parenthetically describing it as "holding that the defendant was not entitled to ancillary defense services under [section] 987.9 because he *no longer faced the death penalty*." (*Id.* at p. 198, italics added.)

██ Nonetheless, the superior court held, and real party in interest vigorously argues, that section 987.9 does not apply unless the district attorney makes a formal declaration that he or she is seeking the death penalty. Such vigor is misplaced. Under the 1977 statutory scheme, unless the district attorney declines to pursue the death penalty, the only legal impediment between a defendant in a special circumstance case and a judgment of death is the trier of fact. The Penal Code provides that once special circumstances are alleged, the trier of fact is then to determine whether the defendant should serve LWOP or face death. (§§ 190.3, 190.4, subd. (a).) Put otherwise, when the district attorney has filed a complaint alleging a charge of murder and special circumstances, the district attorney has effectively—albeit impliedly— "elected" to seek the death penalty, an "election" in force unless and until the district attorney stipulates otherwise. Simply, there is nothing in the Penal Code requiring an express "election" by the district attorney to seek the death penalty, as held in *Abernathy, supra*, 157 Cal.App.4th 642.

In *Abernathy* our colleagues in Division One were faced with the issue— coincidentally arising out of the same superior court as here—whether a defendant in a special circumstance case was entitled to daily preliminary hearing transcripts under section 190.9, subdivision (a)(1), which provides that in "any case in which a death sentence may be imposed," a court reporter is to "prepare and certify a daily transcript of all proceedings commencing with the preliminary hearing." The magistrate "read subdivision (a)(1) [of section 190.9] to require distribution of daily preliminary hearing transcripts only in those cases in which the prosecutor has announced a decision to seek the death penalty" (*Abernathy, supra*, 157 Cal.App.4th at p. 645), and, as the

district attorney had not announced that decision, the magistrate denied the motion. The defendant filed a petition for writ of mandate, which the superior court denied, concluding in part that, "absent the prosecutor's decision[,] . . . daily preliminary hearing transcripts were not required."[7] (157 Cal.App.4th at pp. 645–646.)

Division One reversed, holding that the requirement for daily preliminary hearing transcripts in a special circumstances case did not hinge on an affirmative act by the prosecutor: "As Abernathy correctly argues, the plain language of subdivision (a)(1) is unambiguous. It makes no mention of the prosecutor's decision to seek the death penalty, nor any requirement of a holding order. (§ 872.) Instead, subdivision (a)(1) expressly requires preparation of a daily preliminary hearing transcript '[i]n any case in which a death sentence may be imposed.' *Moreover, no statute or case law requires the prosecutor to give a notice of the intention to seek the death penalty.* Nothing in section 190.9 requires a holding order and the setting of a trial date as prerequisites to the requirement of daily preliminary hearing transcripts." (*Abernathy, supra,* 157 Cal.App.4th at p. 648, fn. omitted & italics added.)

The footnote referenced in the quotation above supports our conclusion. Discussing *Sand,* the footnote observes that "[s]ection 987.9 (requiring funds for indigent defendants in capital cases), for example, does not require notice from the prosecutor. But the district attorney's *voluntary* formal notice declining to seek the death penalty precludes authorization of such funds." (*Abernathy, supra,* 157 Cal.App.4th at p. 648, fn. 5, italics added.)

A 1981 California Attorney General's opinion construing the definition of "capital case" in section 987.9 is also instructive. The question there was whether a minor not eligible for the death penalty was entitled to section 987.9 funds. (64 Ops.Cal.Atty.Gen. 648, 649 (1981).) Answering the question in the negative, the Attorney General first looked to the definition of "capital case" in section 987.9, and concluded it did not apply to minors ineligible for the death penalty, relying on out-of-state authority defining a "capital case" as " 'a criminal case punishable with death' . . . and 'one in which the death penalty may, but need not necessarily, be inflicted.' " (64 Ops.Cal.Atty.Gen., *supra,* at p. 650, citation omitted, quoting *Lee v. State* (1943) 31 Ala.App. 91 [13 So.2d 583, 587] & *State v. Giberson* (1922) 94 N.J. Eq. 25 [119 A. 284].) And, the opinion concludes, "the term 'capital case' as used in Penal Code section 987.9 should be given its usual and ordinary meaning, that is, a case in which the death penalty may be inflicted." (64 Ops.Cal.Atty.Gen., *supra,* at p. 650.)

---

[7] The court also concluded that without " 'a holding order the superior court does not have jurisdiction to conduct a capital trial.' " (*Abernathy, supra,* 157 Cal.App.4th at p. 646.)

■ The California Code of Regulations also recognizes that a special circumstances case is a "capital case" unless the prosecutor stipulates otherwise. Title 2, division 2, chapter 2, subchapter 2.5, article 5 of that code sets forth guidelines for the controller to reimburse counties under section 987.9, one of which allows for reimbursement in a special circumstances case unless it "no longer involves the death penalty." (Cal. Code of Regs., tit. 2, § 1026.2.) The regulation goes on to define a case as no longer "involving the death penalty" as one "where either the allegations of special circumstances have been dismissed or the prosecution has formally elected not to seek the death penalty." (*Ibid.*)

Ignoring what had been the procedure in Contra Costa County before 2009, the district attorney argues that criminal defendants are not entitled to seek section 987.9 funds before the preliminary hearing, noting that the section provides for ancillary funding "[i]n the trial of a capital case." (§ 987.9, subd. (a).) From this, the district attorney extrapolates that section 987.9 could not apply before the preliminary hearing because the case is not in trial posture. This argument is myopic. The purpose of section 987.9 is to provide for ancillary funds "for the preparation or presentation of the defense" in a capital case. (§ 987.9, subd. (a); 5 Witkin & Epstein, Cal. Criminal Law, *supra*, Criminal Trial, § 174, p. 272.) Such defense necessarily includes the preliminary hearing.[8]

■ In sum and in short, a murder case in which special circumstances are alleged is a "capital case" within the meaning of section 987.9, unless and until the prosecution expressly indicates that the death penalty will not be sought. Since it is, the superior court must hear section 987.9 requests on the merits.

Whether an otherwise eligible defendant has made the necessary showing for such ancillary funds is left to the sound discretion of the court. (*People v. Box* (2000) 23 Cal.4th 1153, 1184 [99 Cal.Rptr.2d 69, 5 P.3d 130], disapproved on another ground in *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10 [105 Cal.Rptr.3d 131, 224 P.3d 877]; *People v. Mattson* (1990) 50 Cal.3d 826, 847 [268 Cal.Rptr. 802, 789 P.2d 983].) Focusing on this, the county argues that the denial of section 987.9 funds is reviewed under the abuse of discretion standard and that the trial court properly exercised its

---

[8] Case law supports this self-evident maxim. In *Anderson v. Justice Court* (1979) 99 Cal.App.3d 398 [160 Cal.Rptr. 274], Division Four of this court recognized that section 987.9 applied before the preliminary hearing: "expert or investigative help is necessary to the defense pending the preliminary hearing" because the "preliminary hearing is a critical stage of the criminal process." (99 Cal.App.3d at p. 401.) Observing that a criminal defendant has the right to counsel and the right to cross-examine witnesses and present evidence at the preliminary hearing, the court further held that "due process" requires funding for "any experts that will assist counsel in preparing a defense." (*Ibid.*)

discretion here. The record belies this claim, as the trial court never exercised discretion, concluding that petitioner was not entitled to ancillary funds as a matter of law. In any event, and as we have repeatedly noted, " ' "Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." ' " (*Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 833 [112 Cal.Rptr.2d 284]; see *Lealao v. Beneficial California, Inc.* (2001) 82 Cal.App.4th 19, 25 [97 Cal.Rptr.2d 797].) Acting contrary to specific statutory command, or applying an incorrect legal standard, is accepted as proof of discretion abused. (E.g., *DVD Copy Control Assn., Inc. v. Bunner* (2003) 31 Cal.4th 864, 890 [4 Cal.Rptr.3d 69, 75 P.3d 1]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1134, fn. 18 [26 Cal.Rptr.2d 231, 864 P.2d 502]; *Fasuyi v. Permatex, Inc.* (2008) 167 Cal.App.4th 681, 695–696 [84 Cal.Rptr.3d 351].)

Finally, the amici curiae spare no ink arguing how the trial court's discretion should have been exercised here—indeed, how it should be exercised in the future. These issues are not before us, and we decline to issue an advisory opinion on them, especially as the exercise of discretion is based on the particular facts of the individual case, with the trial court to "balance . . . the interests of the state and those of the defendant." (*Keenan, supra*, 31 Cal.3d at p. 431.)

### 3. *Some closing observations*

Without conceding a capital defendant is entitled to request section 987.9 funding before the preliminary hearing, the district attorney attempts to narrow the funds the defendant should be entitled to receive at that point in the proceeding. Arguing that a capital defendant "enjoys no constitutional right to chase mitigation, before preliminary hearing and before the People have elected to seek death," the district attorney asserts that such a defendant "enjoys a limited right, pre-prelim and pre-election, for investigators and experts," and should only be allowed funds for "negat[ing] probable cause at preliminary hearing" and not to "chase mitigation." Implicit in the district attorney's argument is that mitigation preparation before the preliminary hearing is a waste of public funds. Such argument ignores the statutory language.

To begin with, section 987.9 does not contain some hidden mandate that preparation must begin after the preliminary hearing, precluding early mitigation investigation. To the contrary, it provides for ancillary funding for "preparation or presentation of the defense" in a capital case. (§ 987.9, subd. (a).) Nor do we agree with the implication that prepreliminary hearing funding is never efficient. Early investigation is key for both sides, including

defense investigation into mitigating factors. Capital defense often includes an attempt to convince the district attorney to forgo the death penalty, often accomplished by presenting mitigation evidence as early as possible—a strategy, not incidentally, recognized by objective standards for defense representation in capital cases. The comments to the 2003 American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases are illustrative, explaining that "[i]nvestigation and planning for both [trial and penalty] phases must begin immediately upon counsel's entry into the case, even before the prosecution has affirmatively indicated that it will seek the death penalty." They also counsel that "[c]omprehensive pretrial investigation is a necessary prerequisite to enable counsel to negotiate a plea that will allow the defendant to serve a lesser sentence, to persuade the prosecution to forego seeking a death sentence at trial, or to uncover facts that will make the client legally ineligible for the death penalty." (ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) pp. 5–6.)

 It is true, as the district attorney counters, that the American Bar Association guidelines are not controlling; they are, after all, just guidelines. But, they also are, as the Supreme Court has noted, "guides" as to what "reasonably diligent attorneys" should do in capital cases. (*Bobby v. Van Hook* (2009) 558 U.S. ___, ___ [175 L.Ed.2d 255, 130 S.Ct. 13, 17].)

Finally, the district attorney informs us that he is in the process of modifying his internal death penalty review procedures. Previously, the district attorney made a decision on whether to stipulate to LWOP after his own internal investigation into the case and reviewing defense mitigation evidence. The new procedure will be to consider defense mitigation evidence only after he has made a tentative decision whether or not to stipulate to LWOP. In his words, "I will revise my procedures so that I will not consider *any* mitigating evidence from *any* defendant or from *any* defense attorney, privately retained or appointed, until after I have reached my initial tentative decision to seek the death penalty. I will endeavor to make the election, whether or not to seek the death penalty, before or upon invoking the superior court's trial jurisdiction, in every special circumstance case." This change, the district attorney argues, eradicates the need for early mitigation investigation.

This change may or may not have an impact in individual cases. But we decline to make blanket pronouncements based on an untested procedure applied in the hypothetical. Ancillary funding in capital cases is both serious business and one based on the individual request and the individual situation, to be addressed in the exercise of the trial court's discretion. (*People v. Box, supra*, 23 Cal.4th at p. 1184; *People v. Mattson, supra*, 50 Cal.3d at p. 847.) We decline the district attorney's invitation to change that.

## CONCLUSION AND DISPOSITION

██ A special circumstances case is a "capital case" within the meaning of section 987.9 until the district attorney announces he or she will not seek the death penalty. Since it is, the superior court should have decided petitioner's motion on its merits. But because the death penalty is no longer a possibility for petitioner, the court need not do so in this case, and the order to show cause is discharged and the petition is denied.

Kline, P. J., and Lambden, J., concurred.