Filed 7/31/14

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CALIFORNIA HIGH-SPEED RAIL AUTHORITY et al., | C075668 |
| Petitioners, | (Super. Ct. Nos. 34201100113919CUMCGDS, 34201300140689CUMCGDS) |
| v. | |
| THE SUPERIOR COURT OF SACRAMENTO COUNTY, | |
| Respondent; | |
| JOHN TOS et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDING in mandate. Alternative writ of mandate issued.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Chief Assistant Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Constance L. LeLouis, Tamar Pachter, Sharon L. O'Grady, Paul Stein, and Stephanie F. Zook, Deputy Attorneys General, for Petitioners.

Hanson Bridgett, David J. Miller, and Julia H. Veit for Peninsula Corridor Joint Powers Board and San Mateo County Transit District as Amici Curiae on behalf of Petitioners.

1

Adrienne D. Weil for Metropolitan Transportation Commission as Amicus Curiae on behalf of Petitioners.

Robert Fabela for Santa Clara Valley Transportation Authority as Amicus Curiae on behalf of Petitioners.

Therese M. Stewart, Chief Deputy City Attorney, for City and County of San Francisco as Amicus Curiae on behalf of Petitioners.

Altshuler Berzon, Scott A. Kronland, and Connie K. Chan for State Building and Construction Trades Council of California, AFL-CIO, as Amicus Curiae on behalf of Petitioners.

Gresham Savage Nolan & Tilden, Ellen Berkowitz, Stefanie G. Field, Daniel F. Freedman; Kelly Crane Law and Peter D. Kelly, III, for the Hon. Cathleen Galgiani, California State Senator, as Amicus Curiae on behalf of Petitioners.

John F. Krattli, County Counsel, Charles M. Safer, Assistant County Counsel, and Richard P. Chastang, Principal Deputy County Counsel, for Los Angeles County Metropolitan Transportation Authority as Amicus Curiae on behalf of Petitioners.

Joanna G. Africa for Southern California Association of Governments as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Howard Jarvis Taxpayers Foundation, Jonathan M. Coupal and Timothy A. Bittle for Real Party in Interest Howard Jarvis Taxpayers Association.

Griswold, LaSalle, Cobb, Dowd & Gin, and Raymond L. Carlson for Real Parties in Interest Kings County Water District and Citizens for California High-Speed Rail Accountability.

Law Offices of Stuart M. Flashman, Stuart M. Flashman; and Michael J. Brady for Real Parties in Interest John Tos, Aaron Fukuda, and County of Kings.

Theresa A. Goldner, County Counsel, Mark L. Nations, Chief Deputy County Counsel, and Nicole M. Misner, Deputy County Counsel, for Real Party in Interest County of Kern.

Pillsbury Winthrop Shaw Pittman, Andrew D. Bluth, Michael R. Barr, Kevin M. Fong, and Blaine I. Green for Real Party in Interest Union Pacific Railroad Company.

Pacific Legal Foundation, Meriem L. Hubbard, Harold E. Johnson, and Ralph W. Kasarda for Real Party in Interest First Free Will Baptist Church.

Substantial legal questions loom in the trial court as to whether the high-speed rail project the California High-Speed Rail Authority (Authority) seeks to build is the project approved by the voters in 2008. Substantial financial and environmental questions remain to be answered by the Authority in the final funding plan the voters required for each corridor or usable segment of the project. (Sts. & Hy. Code, § 2704.08, subd. (d).)[1] But those questions are not before us in these validation and mandamus proceedings. The scope of our decision is quite narrow. Applying time-honored principles of statutory construction, separation of powers, and the availability of extraordinary writ relief, we conclude:

1. Contrary to the trial court's determination, the High-Speed Passenger Train Finance Committee properly found that issuance of bonds for the project was necessary or desirable.

2. The preliminary section 2704.08, subdivision (c) funding plan was intended to provide guidance to the Legislature in acting on the Authority's appropriation request. Because the Legislature appropriated bond proceeds following receipt of the preliminary funding plan approved by the Authority, the preliminary funding plan has served its purpose. A writ of mandamus will not lie to compel the idle act of rescinding and redoing it.

We therefore will issue a peremptory writ of mandate directing the trial court to enter judgment validating the authorization of the bond issuance for purposes of the 2008 voter approved Safe, Reliable High-Speed Passenger Train Bond Act. (Bond Act)

---

[1] Further undesignated statutory references are to the Streets and Highways Code.

3

(§ 2704 et seq.; see § 2704.04, subd. (a).)  Further challenges by real parties in interest to the use of bond proceeds are premature.  The writ will also compel the trial court to vacate its rulings requiring the Authority to perform the idle act of redoing the preliminary section 2704.08, subdivision (c) funding plan after the Legislature appropriated the bond funds.

## FACTUAL AND PROCEDURAL CONTEXT[2]

On November 4, 2008, the voters of California passed Proposition 1A, the Bond Act, "to initiate the construction of a high-speed train system that connects the San Francisco Transbay Terminal to Los Angeles Union Station and Anaheim, and links the state's major population centers, including Sacramento, the San Francisco Bay Area, the Central Valley, Los Angeles, the Inland Empire, Orange County, and San Diego . . . ." (§ 2704.04, subd. (a); see § 2704 et seq.)  The Bond Act authorizes the issuance and sale of $9.95 billion in general obligation bonds "upon appropriation by the Legislature" (§ 2704.04, subd. (b)(1); see § 2704.10) to begin construction of a high-speed train system in California "consistent with the [A]uthority's certified environmental impact reports of November 2005 and July 9, 2008, as subsequently modified pursuant to environmental studies conducted by the [A]uthority" (§ 2704.06).

The Bond Act sets forth specific criteria for the bond proceeds as well as for the design and capacity of the system.  For instance, no more than $950 million of bond proceeds can be used for non-high-speed rail connectivity with high-speed rail lines. (§ 2704.095.)  High-speed rail, the Act provides, will feature electric trains capable of operating at speeds of 200 miles per hour or greater, guaranteed maximum travel times between major destinations, and achievable operating headway (time between successive trains) of five minutes or less.  (§ 2704.09, subds. (a), (b) & (c).)

---

[2] We refer to the parties throughout this opinion by their appellate court designations.

4

The Authority is the administrative body with primary responsibility for overseeing the planning and construction of the high-speed rail system. (Sts. & Hy. Code, § 2704.01, term (b); Pub. Util. Code, § 185020.) The Authority is subject to the terms of the financing program set forth in article 2 and the fiscal provisions set forth in article 3 of the Bond Act. (Sts. & Hy. Code, §§ 2704.04 et seq., 2704.10 et seq.) The Argument in favor of Proposition 1A promised the voters: "Proposition 1A will protect taxpayer interests. [¶] • Public oversight and detailed independent review of financing plans. [¶] • Matching private and federal funding to be identified BEFORE state bond funds are spent. [¶] • 90% of the bond funds to be spent on system construction, not more studies, plans, and engineering activities." (Voter Information Guide, General Elec. (Nov. 4, 2008) argument in favor of Prop. 1A, p. 6.)

The Bond Act incorporates by reference the State General Obligation Bond Law, Government Code section 16720 et seq. (Bond Law), which provides a uniform procedure for authorizing the issuance, sale, and repayment of general obligation bonds on behalf of the state. (Sts. & Hy. Code, § 2704.11.) The Bond Act designates the Authority to act as the "board" for purposes of all Bond Law procedures (Sts. & Hy. Code, § 2704.12, subd. (b)), including the authority to request that the "[c]ommittee" authorize the issuance of bonds (Gov. Code, § 16722, term (d)). The Bond Act also creates a High-Speed Passenger Train Finance Committee (Finance Committee) to serve in the same capacity as the "[c]ommittee" named in the Bond Law, "[s]olely for the purpose of authorizing the issuance and sale of the bonds authorized by [the Bond Act]." (Sts. & Hy. Code, § 2704.12, subd. (a).)

Article 2, section 2704.08 is at the heart of the writ proceeding now before us. Pursuant to subdivision (a) of section 2704.08, the bond proceeds cannot be used for more than 50 percent of the total cost of construction for each usable segment or corridor. "Corridor," as used in the Bond Act, is "a portion of the high-speed train system as

described in Section 2704.04" (§ 2704.01, term (f)),[3] and "usable segment" is "a portion of a corridor that includes at least two stations" (§ 2704.01, term (g)).  Section 2704.08 compels the Authority to prepare a preliminary funding plan (§ 2704.08, subd. (c)) before the Legislature appropriates the funds and a final funding plan (§ 2704.08, subd. (d)) before the proceeds of bonds are committed for expenditure.[4]  We must determine whether a writ of mandamus is an appropriate remedy when, despite receipt of an allegedly deficient preliminary funding plan, the Legislature appropriates the requested funds, thereby authorizing the issuance and sale of bonds.

Streets and Highways Code section 2704.08, subdivision (c) provides as follows: "(c)(1) No later than 90 days prior to the submittal to the Legislature and the Governor of

_____

[3]  Seven corridors are described:
   (A) Sacramento to Stockton to Fresno.
   (B) San Francisco Transbay Terminal to San Jose to Fresno.
   (C) Oakland to San Jose.
   (D) Fresno to Bakersfield to Palmdale to Los Angeles Union Station.
   (E) Los Angeles Union Station to Riverside to San Diego.
   (F) Los Angeles Union Station to Anaheim to Irvine.
   (G) Merced to Stockton to Oakland and San Francisco via the Altamont Corridor.

[4]  We acknowledge that the statute does not characterize the Streets and Highways Code section 2704.08, subdivision (c) detailed funding plan as "preliminary" or the section 2704.08, subdivision (d) detailed funding plan as "final."  A contextual reading of the Bond Act, however, reveals that the two funding plans are part of a comprehensive legislative scheme:  the first to be presented to the Legislature before the appropriation of bond funds and the second to be approved before the actual expenditure of bond proceeds.  The inclusion of the subdivision (d) plan is an explicit recognition that new, and possibly different, information will be needed to supplement or augment the preappropriation subdivision (c) plan, and further, that the preappropriation or "preliminary" plan is in no way intended to be a final or conclusive administrative action. Indeed, the Legislature characterized the subdivision (c) funding plan as the "preappropriation review process" and the subdivision (d) funding plan as the "preexpenditure review process."  (Pub. Util. Code, § 185033, subd. (b)(2).)  For these reasons, we will refer to the section 2704.08, subdivision (c) plan as preliminary and the section 2704.08, subdivision (d) plan as final.

the initial request for appropriation of proceeds of bonds authorized by this chapter for any eligible capital costs on each corridor, or usable segment thereof . . . the authority shall have approved and submitted to the Director of Finance, the peer review group established pursuant to Section 185035 of the Public Utilities Code, and the policy committees with jurisdiction over transportation matters and the fiscal committees in both houses of the Legislature, a detailed funding plan for that corridor or a usable segment thereof.

"(2) The plan shall include, identify, or certify to all of the following:

"(A) The corridor, or usable segment thereof, in which the authority is proposing to invest bond proceeds.

"(B) A description of the expected terms and conditions associated with any lease agreement or franchise agreement proposed to be entered into by the authority and any other party for the construction or operation of passenger train service along the corridor or usable segment thereof.

"(C) The estimated full cost of constructing the corridor or usable segment thereof, including an estimate of cost escalation during construction and appropriate reserves for contingencies.

"(D) The sources of all funds to be invested in the corridor, or usable segment thereof, and the anticipated time of receipt of those funds based on expected commitments, authorizations, agreements, allocations, or other means.

"(E) The projected ridership and operating revenue estimate based on projected high-speed passenger train operations on the corridor or usable segment.

"(F) All known or foreseeable risks associated with the construction and operation of high-speed passenger train service along the corridor or usable segment thereof and the process and actions the authority will undertake to manage those risks.

"(G) Construction of the corridor or usable segment thereof can be completed as proposed in the plan.

"(H) The corridor or usable segment thereof would be suitable and ready for high-speed train operation.

"(I) One or more passenger service providers can begin using the tracks or stations for passenger train service.

"(J) The planned passenger service by the authority in the corridor or usable segment thereof will not require a local, state, or federal operating subsidy.

"(K) The authority has completed all necessary project level environmental clearances necessary to proceed to construction."

Section 2704.08, subdivision (d) requires a final, preexpenditure funding plan as follows: "Prior to committing any proceeds of bonds described in paragraph (1) of subdivision (b) of Section 2704.04 for expenditure for construction and real property and equipment acquisition on each corridor, or usable segment thereof, other than for costs described in subdivision (g), the authority shall have approved and concurrently submitted to the Director of Finance and the Chairperson of the Joint Legislative Budget Committee the following: (1) a detailed funding plan for that corridor or usable segment thereof that (A) identifies the corridor or usable segment thereof, and the estimated full cost of constructing the corridor or usable segment thereof, (B) identifies the sources of all funds to be used and anticipates time of receipt thereof based on offered commitments by private parties, and authorizations, allocations, or other assurances received from governmental agencies, (C) includes a projected ridership and operating revenue report, (D) includes a construction cost projection including estimates of cost escalation during construction and appropriate reserves for contingencies, (E) includes a report describing any material changes from the plan submitted pursuant to subdivision (c) for this corridor or usable segment thereof, and (F) describes the terms and conditions associated with any agreement proposed to be entered into by the authority and any other party for the construction or operation of passenger train service along the corridor or usable segment thereof; and (2) a report or reports, prepared by one or more financial services firms,

8

financial consulting firms, or other consultants, independent of any parties, other than the authority, involved in funding or constructing the high-speed train system, indicating that (A) construction of the corridor or usable segment thereof can be completed as proposed in the plan submitted pursuant to paragraph (1), (B) if so completed, the corridor or usable segment thereof would be suitable and ready for high-speed train operation, (C) upon completion, one or more passenger service providers can begin using the tracks or stations for passenger train service, (D) the planned passenger train service to be provided by the authority, or pursuant to its authority, will not require operating subsidy, and (E) an assessment of risk and the risk mitigation strategies proposed to be employed. The Director of Finance shall review the plan within 60 days of its submission by the authority and, after receiving any communication from the Joint Legislative Budget Committee, if the director finds that the plan is likely to be successfully implemented as proposed, the authority may enter into commitments to expend bond funds that are subject to this subdivision and accept offered commitments from private parties."

Proposition 1A also established the Finance Committee, which consists of five senior government officials:  the California State Treasurer; the Director of the Department of Finance; the California State Controller; the Secretary of Business, Transportation and Housing; and the chairperson of the Authority.  (§ 2704.12, subd. (a).) The Finance Committee is the administrative body with primary responsibility for authorizing the issuance of bonds that will be used to finance initial construction of the high-speed rail system.  (*Ibid.*)  Section 2704.13 provides, in relevant part:  "The committee shall determine whether or not it is necessary or desirable to issue bonds authorized pursuant to this chapter in order to carry out the actions specified in Sections 2704.06 and 2704.095 and, if so, the amount of bonds to be issued and sold. Successive issues of bonds may be issued and sold to carry out those actions progressively, and it is not necessary that all of the bonds authorized be issued and sold at any one time.  The committee shall consider program funding needs, revenue projections,

financial market conditions, and other necessary factors in determining the term for the bonds to be issued.  In addition to all other powers specifically granted in this chapter and the State General Obligation Bond Law, the committee may do all things necessary or convenient to carry out the powers and purposes of this article, including the approval of any indenture relating to the bonds, and the delegation of necessary duties to the chairperson and to the Treasurer as agent for the sale of the bonds."

The peer review group plays another significant role in providing financial oversight and monitoring the feasibility of the Authority's plans.  Public Utilities Code section 185035 provides, in relevant part:  "(a) The authority shall establish an independent peer review group for the purpose of reviewing the planning, engineering, financing, and other elements of the authority's plans and issuing an analysis of appropriateness and accuracy of the authority's assumptions and an analysis of the viability of the authority's financing plan, including the funding plan for each corridor required pursuant to subdivision (b) of Section 2704.08 of the Streets and Highways Code.  [¶] . . . [¶]  (c) The peer review group shall evaluate the authority's funding plans and prepare its independent judgment as to the feasibility and reasonableness of the plans, appropriateness of assumptions, analyses, and estimates, and any other observations or evaluations it deems necessary."

The Authority is also required to "prepare, publish, adopt, and submit to the Legislature, not later than January 1, 2012, and every two years thereafter, a business plan.  At least 60 days prior to the publication of the plan, the authority shall publish a draft business plan for public review and comment.  The draft plan shall also be submitted to the Senate Committee on Transportation and Housing, the Assembly Committee on Transportation, the Senate Committee on Budget and Fiscal Review, and the Assembly Committee on Budget."  (Pub. Util. Code, § 185033, former subd. (a), as amended by Stats. 2009, ch. 618, § 1.)  "The business plan shall identify all of the following:  the type of service the authority anticipates it will develop, such as local,

10

express, commuter, regional, or interregional; a description of the primary benefits the system will provide; a forecast of the anticipated patronage, operating and maintenance costs, and capital costs for the system; an estimate and description of the total anticipated federal, state, local, and other funds the authority intends to access to fund the construction and operation of the system; and the proposed chronology for the construction of the eligible corridors of the statewide high-speed train system.  The business plan shall also include a discussion of all reasonably foreseeable risks the project may encounter, including, but not limited to, risks associated with the project's finances, patronage, right-of-way acquisition, environmental clearances, construction, equipment, and technology, and other risks associated with the project's development. The plan shall describe the authority's strategies, processes, or other actions it intends to utilize to manage those risks."  (*Ibid.*)

The Authority certified the preliminary funding plan two days after issuing the "Draft 2012 Business Plan" (draft business plan).  The draft business plan identified the "corridor, or usable segment thereof," as one of two alternative initial operating sections (IOS):  IOS-North, a usable segment of approximately 290 miles from Bakersfield in the south to San Jose in the north, or IOS-South, an alternative usable segment of approximately 300 miles from Merced in the north to the San Fernando Valley in the south.  To the consternation of the peer review group, the preliminary funding plan expressly incorporated the draft business plan and proposed an investment of $2.684 billion in bonds authorized under Proposition 1A, the amount needed to supplement the $3.316 billion in federal funds awarded for construction of the initial construction section (ICS), a 130-mile conventional rail portion of the system.  Because of the stringent 60-day deadline to complete its assessment of the preliminary funding plan, the peer review group was put "in the position of reaching findings and conclusions on the Funding Plan based upon the content of a foundational Business Plan document that is still in draft form."  (See Pub. Util. Code, § 185035.)

11

On November 14, 2011, John Tos, Aaron Fukuda, and County of Kings (the Tos real parties) filed their initial complaint for declaratory relief, injunctive relief, and for relief pursuant to Code of Civil Procedure section 526a and the private attorney general doctrine (Tos action), alleging, among other things, that the preliminary funding plan violated the Bond Act. On December 13, 2011, the complaint was amended to add a cause of action seeking relief in the form of a writ of mandamus/prohibition. On January 3, 2012, the peer review group submitted a report to the Legislature outlining weaknesses in the preliminary funding plan and draft business plan, and offering a number of suggestions to improve the viability of the high-speed rail project.

On April 19, 2012, the Authority adopted the "Revised 2012 Business Plan" (revised business plan). The revised business plan identifies a 300-mile "usable segment" from Merced to the San Fernando Valley (IOS-South), but unlike the draft business plan, the revised business plan commits "to build not just an initial construction segment but in fact an Initial Operating Section (IOS) of high-speed rail." Moreover, the revised business plan introduced a "blended systems" approach that integrates high-speed rail with existing commuter lines in various urban areas. The revised business plan states: "Passengers will have more options, faster travel times, and greater reliability and safety. . . . [¶] Benefits will be delivered *faster* through the adoption of the blended approach and through investment in the bookends. Across the state, transportation systems will be improved and jobs will be created through the implementation of those improvements."

On April 17, 2012, the Legislative Analyst's office (LAO) issued a report providing a negative critique of the revised business plan for the Legislature. The report states: "In April 2012, the [Authority] released its most recent business plan that estimates the cost of constructing the first phase of the high-speed train project at $68 billion. However, the [Authority] only has secured about $9 billion in voter approved bond funds and $3.5 billion in federal funds. Thus, the availability of future

12

funding to construct the system is highly uncertain." (Legis. Analyst, The 2012-13 Budget: Funding Requests for High-Speed Rail, Apr. 17, 2012, p. 1.) Thus, the LAO concludes: "We find that [the Authority] has not provided sufficient detail and justification to the Legislature regarding its plan to build a high-speed train system. Specifically, funding for the project remains highly speculative and important details have not been sorted out. We recommend the Legislature not approve the Governor's various budget proposals to provide additional funding for the project. However, we recommend that some minimal funding be provided to continue planning efforts that are currently underway." (*Ibid.*)

On July 18, 2012, nearly four years after adoption of the Bond Act and after extensive studies, planning, public hearings, and debate, the Legislature enacted Senate Bill No. 1029 (Stats. 2012, ch. 152), thereby appropriating state funds and federal grants for high-speed rail as follows:

A total of $819,333,000 "for capital improvement projects to intercity and commuter rail lines and urban rail systems that provide direct connectivity to the high-speed train system and its facilities . . . ." (Stats. 2012, ch. 152, §§ 1, 2.)

"Bookend" funding of $1.1 billion "for expenditure for state operations, local assistance, or capital outlay . . . ." (Stats. 2012, ch. 152, § 3.)

A total of $48,354,000 "[f]or capital outlay, High-Speed Rail Authority, payable from the Federal Trust Fund . . . ." (Stats. 2012, ch. 152, §§ 4, 6.)

A total of $204,173,000 "[f]or capital outlay, High-Speed Rail Authority, payable from the High-Speed Passenger Train Bond Fund . . . ." (Stats. 2012, ch. 152, §§ 5, 7.)

To acquire and build the IOS, $3,240,676,000, payable from the Federal Trust Fund. (Stats. 2012, ch. 152, § 8.)

To acquire and build the IOS, $2,609,076,000, payable from the High-Speed Passenger Train Bond Fund. (Stats. 2012, ch. 152, § 9.)

13

As will be described in further detail, *post*, the Legislature itself enforced the rigid reporting provisions of section 2704.08, subdivision (c) of the Bond Act by requiring the Authority to submit additional reports and obtain additional approvals before the funds appropriated could be encumbered. (Stats. 2012, ch. 152, § 3.)

On March 18, 2013, the Authority adopted Resolution # HSRA 13-03 requesting the Finance Committee "to authorize issuance of bonds and commercial paper notes under the Bond Act to provide funds for the projects as authorized in sections 2704.04 and 2704.06 of the California Streets and Highways Code in the aggregate principal amount of $8,599,715,000." That same day, the Finance Committee, consistent with section 2704.13, adopted Resolution IX (2013) declaring that it was necessary and desirable "to authorize the issuance hereunder of $8,599,715,000 in [the] principal amount (the 'Authorized Amount') of general obligation bonds (the 'Bonds') and other obligations pursuant to this Resolution to carry out the purposes" of the Bond Act.

If our arithmetic is correct, therefore, in 2012 the Legislature appropriated a total of $4,732,582,000 in Bond Act funds and $3,289,030,000 from the Federal Trust Fund to finance high-speed rail in California. Of the $8,021,609,000 total funds appropriated by the Legislature, approximately $6.1 billion was appropriated to finance IOS-South. In 2013 the Authority requested, and the Finance Committee authorized, the issuance of bonds under the Bond Act in the aggregate principal amount of $8,599,715,000.

The following day, March 19, 2013, the Authority and the Finance Committee filed a validation action to obtain a judgment validating the bonds so they could be sold on the capital markets. (Code Civ. Proc., § 860 et seq.; Gov, Code, § 17700.) John Tos, Aaron Fukuda, County of Kings, Howard Jarvis Taxpayers Association, Kings County Water District, Citizens for California High-Speed Rail Accountability, Eugene Voiland, County of Kern, and First Free Will Baptist Church opposed the action; Union Pacific Railroad Company filed a responsive pleading as an interested party in the validation action (collectively, real parties in interest).

14

The trial court bifurcated the writ of mandate issues from the other remedies the Tos real parties sought in the Tos action. Over time, the Tos real parties had amended their complaint several times, with the operative allegations contained in the second amended complaint, which set forth 12 sweeping causes of action. However, at the first hearing on May 31, 2013, the scope of the petition for a writ of mandamus was narrowed to two deficiencies in the preliminary funding plan, which are at issue before us in this appeal.

First, the Tos real parties allege that it will cost at least an additional $20 billion to complete the last 170 miles of the 300-mile usable segment, and contrary to the mandatory terms of Proposition 1A, the sources of these funds have not been identified and committed. (§ 2704.08, subd. (c)(2)(D) ["(2) The [preliminary funding] plan shall include, identify, or certify to all of the following: [¶] . . . [¶] (D) The sources of all funds to be invested in the corridor, or usable segment thereof, and the anticipated time of receipt of those funds based on expected commitments, authorizations, agreements, allocations, or other means."].)

Second, the Tos real parties complain that the Authority failed to obtain the necessary environmental clearances before approving the preliminary funding plan. (§ 2704.08, subd. (c)(2)(K) ["(2) The [preliminary funding] plan shall include, identify, or certify to all of the following: [¶] . . . [¶] (K) The Authority has completed all necessary project level environmental clearances necessary to proceed to construction."].) "[The Tos real parties] specifically allege that the environmental review process required by Proposition 1A is far from complete, it is in its infancy with respect to the section between Fresno and Bakersfield. In addition, major environmental litigation has just been filed in the Central Valley challenging the adequacy of some of the environmental studies. Additionally, [the Tos real parties] allege that the environmental clearances necessary for defendants to commence construction of the Central Valley project have

15

not been obtained from the U.S. Corps of Engineers, the U.S. Fish and Wildlife Service, and the San Joaquin Valley Air Pollution Control District."

On August 16, 2013, the trial court issued a 15-page ruling explaining that the preliminary funding plan submitted by the Authority to the Legislature did not comply with the Bond Act. (§ 2704.08, subd. (c)(2)(D) & (K).)

There is no dispute that the Authority identified the necessary funding sources for the ICS, amounting to approximately $6 billion in combined federal and state funding. The court pointed out, however, that section 2704.08, subdivision (c)(2)(D) requires identification of funding sources for the entire IOS, and the full cost of completing IOS-South was projected to be in excess of $26 billion. In the trial court's view, subdivision (c)(2)(D) "required the Authority to identify sources of funds that were more than merely theoretically possible, but instead were reasonably expected to be actually available when needed. This is clear from the language of the statute requiring the Authority to describe the 'anticipated time of receipt of those funds based on expected commitments, authorizations, agreements, allocations, or other means.' (Emphasis added [by trial court].) Such language, especially the use of the highlighted terms 'anticipated' and 'expected', indicates that the identification of funds must be based on a reasonable present expectation of receipt on a projected date, and not merely a hope or possibility that such funds may become available."

The trial court quoted at some length from the draft business plan, rather than the revised business plan. The court noted the draft business plan explicitly stated "that funds for construction of the remainder of the IOS would be identified at a later time ('not later than 2015')" and "candidly acknowledged that committed funding for construction of the IOS in the years 2015 to 2021 'is not fully identified', and that 'the mix, timing, and amount of federal funding for later sections of the [high-speed rail] is not known at this time." The court concluded, "This language demonstrates that the

16

funding plan failed to comply with the statute, because it simply did not identify funds available for the completion of the entire IOS."

Rejecting arguments lodged by the Attorney General construing the statute to allow completion of all environmental clearances before construction rather than before the preliminary funding plan is approved, the trial court held: "Subsection (K), on its face, requires the Authority to certify that it has completed all necessary project level environmental clearances necessary to proceed to construction. As the language from the funding plan quoted above demonstrates, the plan does not address project level environmental clearances for the entire IOS at all, but only addresses the ICS. Moreover, the funding plan explicitly states that project level environmental clearances have not yet been completed even for the ICS. It is therefore manifest that the funding plan does not comply with the plain language of the statute."

Although the trial court found the preliminary funding plan was deficient, the court remained uncertain whether a writ of mandate would lie to compel the Authority to rescind it in light of its conclusion that a writ would not issue to invalidate the legislative appropriation both on substantive and procedural grounds.

Substantively, the court explained: "Nothing in Section 2704.08[, subdivision] (c)(2), or elsewhere in Proposition 1A, provides that the Legislature shall not or may not make an appropriation for the high-speed rail program if the initial funding plan required by Section 2704.08[, subdivision] (c)(2) fails to comply with all the requirements of the statute. Lacking such a consequence for the Authority's non-compliance, Proposition 1A appears to entrust the question of whether to make an appropriation based on the funding plan to the Legislature's collective judgment. The terms of Proposition 1A itself give the Court no authority to interfere with that exercise of judgment."

Procedurally, the court pointed out that the Tos real parties did not seek invalidation of the legislative appropriation in the second amended complaint and raised

17

the issue for the first time in their reply brief. The court subscribed to the general rule that, in fairness to petitioners, arguments raised for the first time in reply would not be considered.

If, as the trial court found, the appropriation was not subject to challenge, the question posed is whether a writ of mandate to rescind the preliminary funding plan would have any real and practical effect. The court asked for supplemental briefing to determine whether the writ could invalidate any subsequent approvals by the Authority or any of the other petitioners. If so, the court intimated that a writ might offer a real and practical benefit.

A second hearing was held on November 8, 2013, and the court issued its second ruling on November 25, 2013. The trial court issued a writ of mandate directing the Authority to rescind its approval of the November 3, 2011, preliminary funding plan because "the preparation and approval of a detailed funding plan that complies with all of the requirements of Streets and Highways Code section 2704.08[, subdivision] (c) is a necessary prerequisite for the preparation and approval of a second detailed funding plan under subdivision (d) of the statute, which in turn is a necessary prerequisite to the Authority's expenditure of any bond proceeds for construction or real property and equipment acquisition, other than for costs described in subdivision (g)." Thus, the trial court concluded, the writ would have a real and practical effect.

The court, however, denied the Tos real parties the many other remedies they sought. It refused to issue a writ to invalidate any subsequent approvals made by the Authority in reliance on the November 3, 2011, preliminary funding plan, including contracts with Caltrans and Tutor-Perini-Parsons, because there was insufficient evidence the Authority, in utilizing federal grant money, had violated any of the limitations set by Proposition 1A and the contracts contained termination clauses to assure that the state did not transgress those limitations. The court also refused to (1) enjoin the Authority from submitting a final funding plan until its preliminary funding plan complies with

18

section 2704.08, subdivision (c); (2) issue a temporary restraining order to prohibit the Authority from using federal grant money; and (3) order an accounting of past and projected expenditures on the high-speed rail project.

On the same day the trial court issued its ruling in the Tos action, it denied the Authority and Finance Committee's request for a validation judgment approving the issuance of more than $8 billion in bonds. The court found that the Finance Committee's determination that issuance of the bonds was necessary or desirable was a quasi-legislative act that must be supported by evidence in the record. The court explained that it could "find no evidence in the record of proceedings submitted by [the Authority and the Finance Committee] that supports a determination that it was necessary or desirable to authorize the issuance of more than eight billion dollars in bonds under Proposition 1A as of March 18, 2013. The record of proceedings in this matter consists of little more than the Authority's Resolution requesting that the Finance Committee authorize issuance of bonds, and the Finance Committee's Resolutions doing so. The Finance Committee's Resolutions contain bare findings of necessity and desirability which contain no explanations of how, or on what basis, it made those findings. Specifically, the findings contain no summary of the factors the Finance Committee considered and no description of the content of any documentary or other evidence it may have received and considered. Thus the findings themselves do not assist the Court in determining whether those findings are supported by any evidence."

The Authority, the Finance Committee, and others thereafter filed a petition for a writ of mandamus for relief in both cases.[5] Petitioners ask us to issue a peremptory writ

---

[5] Petitioners also include Governor Edmund G. Brown, Jr.; State Treasurer Bill Lockyer; Director of the Department of Finance, Michael Cohen; and Secretary of the State Transportation Agency, Brian Kelly. Petitioners initially filed their petition with the California Supreme Court. The Supreme Court transferred the case to us.

19

of mandate directing the trial court to vacate its writ in the Tos action and to vacate its ruling in the validation case, and to enter a judgment validating the bonds authorized by the Finance Committee.

## DISCUSSION

## I

### The Validation Action

Neither the Bond Law, the Bond Act, nor any of the validation cases we could find support the trial court's highly unusual scrutiny of the Finance Committee's determination that it is "necessary or desirable" to grant the Authority's request to authorize the issuance of the bonds. The Attorney General, supported by amici curiae, argues the trial court's notion that the voters intended the Finance Committee to serve as the " ' "keeper of the checkbook" ' " not only thwarts progress building a high-speed rail system in California, but jeopardizes the financing of public infrastructure throughout the state by interfering with the Legislature's exercise of its appropriation authority, invents judicial remedies where none are provided by law, and subverts the very purpose of the validation statutes. We agree.

Validation actions embody a strong public policy to facilitate a public agency's ability to finance infrastructure for the public good. Recognizing that litigation often impairs a public agency's ability to sell bonds on the capital market, the validation statutes place great importance on the need for a speedy and single dispositive final judgment. We must construe the validating statutes so as to effectuate their purpose. (*Friedland v. City of Long Beach* (1998) 62 Cal.App.4th 835, 842-843.)

By refusing to validate the authorization of bonds due to a lack of evidence "in the record of proceedings" before the Finance Committee, the court imposed requirements on the Finance Committee that do not appear in any of the governing statutes and thereby denied the Authority the speedy, dispositive judgment the validation action was designed to provide. Neither the Bond Law nor the specific Bond Act requires the Finance

20

Committee to make any factual findings or to explain the basis for its determination. Similarly, real parties in interest do not point to any statute that requires the Finance Committee to hold an evidentiary hearing. Without limitation or restriction, the Bond Act and the Bond Law grant the Finance Committee broad discretion to determine whether it is "necessary or desirable" to authorize the issuance of bonds to carry out the purposes of the Bond Act. (Sts. & Hy. Code, § 2704.13; Gov. Code, §§ 16722, subd. (a), 16730.)

Cases construing the "necessary or desirable" language uniformly recognize the breadth of discretion it confers upon an administrative or legislative body. In construing the "necessary or desirable" language, the Fourth District Court of Appeal wrote that the words "are probably so elastic as not to impose any substantive requirements." (*Boelts v. City of Lake Forest* (2005) 127 Cal.App.4th 116, 128, fn. 13 (*Boelts*).) Similarly, over eight decades ago, the Second Appellate District held that a legislative body's discretion should not be curtailed by implying requirements that it justify its determination of necessary or desirable. (*City of Monrovia v. Black* (1928) 88 Cal.App. 686, 690.) The court concluded, "In the absence of any such requirement in the statute, the determination of the legislative body that the fact exists on which their power to act depends is sufficiently indicated by their proceeding to act." (*Ibid.*)

And as far back as 1947, the Second District Court of Appeal characterized the law as "well settled" and explained: "[T]he question as to whether such a rule is 'necessary and desirable' is not a judicial question. The courts are not charged with the responsibility of determining the wisdom of the rule. That question was for the board to determine. And as the trial judge observed, 'That the board deemed the rule desirable is evidenced conclusively by its adoption.' " (*Perez v. Board of Police Commrs.* (1947) 78 Cal.App.2d 638, 643.)

The Authority does not suggest that the validity of bond authorization is never subject to judicial review, that a bond finance committee can or should approve every

21

request for bond authorization as a matter of course, or that courts must validate every authorization of bonds for which validation is sought. Rather, the Authority focuses on the exceptionally broad discretion conferred on any administrative or legislative body charged with making the mere determination that an action is desirable. Given such unencumbered discretion, there is little room for judicial intervention. Real parties in interest simply fail to appreciate the critical distinction between other types of challenges to validation and the very specific determination made by the Finance Committee that the issuance of the bonds was necessary or desirable. Thus, their reliance on *Boelts*, *supra*, 127 Cal.App.4th 116 and *Poway Royal Mobilehome Owners Assn. v. City of Poway* (2007) 149 Cal.App.4th 1460 (*Poway*) misses the mark.

Indeed, *Boelts* highlights the distinction real parties in interest ignore. The case involved a reverse validation action challenging the validity of an amendment to a redevelopment plan. (*Boelts*, *supra*, 127 Cal.App.4th at p. 125.) The community redevelopment laws required the city to make a finding that the project area was blighted "based on clearly articulated and documented evidence." (Health & Saf. Code, § 33367, subd. (d); see *Boelts*, at p. 127.) Because the governing statute expressly circumscribed the legislative body's discretion by requiring evidence to support the finding, the court invoked the familiar substantial evidence standard of review. (*Boelts*, at p. 134.) By contrast, the statutory requirement that the legislative body find that an amendment to a redevelopment plan was " 'necessary or desirable' " was not substantive and did not limit the city's discretion. (*Id*. at p. 128, fn. 13.) The "necessary or desirable" determination was not subject to judicial review in *Boelts*.

*Poway*, *supra*, 149 Cal.App.4th 1460 also is inapposite. According to pertinent federal law, the city was required to hold a public hearing before the bond qualified to be used for a residential rental project for low income residents. (26 U.S.C. § 147(f)(2)(B)(i); *Poway*, at p. 1482.) The city noticed a hearing and thereafter adopted resolutions approving the sale of a mobile home park to the redevelopment agency.

22

(*Poway*, at p. 1482.) The homeowners association challenged a judgment in the ensuing validation action, claiming the city presented no evidence at the hearing to support the sale. (*Ibid*.) Because the city was compelled by law to hold a hearing, the Court of Appeal invoked the substantial evidence standard of review. "We examine the administrative record to determine whether substantial evidence supports the trial court's findings." (*Id*. at p. 1479.)

Finance committees under the Bond Law, and the Finance Committee established by the Bond Act, are given the statutory charge to determine when the issuance of bonds is "necessary or desirable," but they are not required to conduct a hearing, take evidence, or make findings. The Bond Act does not require the Authority to provide any support to the Finance Committee for its request for authorization of the issuance of the bonds, apparently contemplating that all the necessary support is provided through the reports the Authority is required by section 2704.08 to submit to the Legislature. Real parties in interest have cited no statute that imposes duties on a finance committee commensurate with the evidentiary requirements compelled by the statutes applicable in *Boelts* and *Poway*. As a result, real parties in interest offer neither a statute nor an analogous case to support the novel proposition that a "necessary or desirable" determination must be supported by substantial evidence in the administrative record.

Moreover, such an intrusive standard would offend the fundamental separation of powers between the legislative and judicial branches of government. The Supreme Court has cautioned courts to exercise a highly deferential and limited review, "out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority." (*California Hotel & Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 211-212.) Where, as here, the administrative agency performs a discretionary quasi-legislative act, judicial review is at the far end of a continuum requiring the utmost deference. (*Carrancho v. California Air Resources*

23

*Board* (2003) 111 Cal.App.4th 1255, 1265.)  An agency's exercise of discretionary legislative power will be disturbed "*only* if the action taken is so palpably unreasonable and arbitrary as to show an abuse of discretion as a matter of law.  This is a highly deferential test.  [Citation.]" (*Ibid.*)

There is no support for real parties in interest's allegation that the Finance Committee's determination was arbitrary, capricious, or palpably unreasonable as a matter of law.  The only basis required by the Bond Act for the Finance Committee to act is the Authority's request to the Finance Committee.  (Sts. & Hy. Code, § 2704.11, subd. (a), incorporating Gov. Code, § 16730; Sts. & Hy. Code, § 2704.13.)  The request contained all the information that the Finance Committee needed to authorize bonds for validation–the fact that the Authority was requesting the authorization of bonds pursuant to the Bond Act and only for purposes authorized by the Bond Act.  The Finance Committee also had before it a draft resolution detailing the authorization of the bonds and the structure of the eventual sales, including that the bonds sold would not exceed the appropriation authorized by the Legislature.  As a result, the Finance Committee's determination that it is "necessary or desirable" to authorize issuance of the bonds to carry out the purposes of the Bond Act rests on the draft resolution and the Finance Committee's assessment of need, unencumbered by the need to identify the facts or express reasons for supporting the determination.  Real parties in interest would have us impose more of an evidentiary burden on the Finance Committee than is required by the governing statute, and thus would have us cramp the broad discretion the Finance Committee is afforded by the applicable statutes and intrude into the quasi-legislative role it was assigned by the voters.  We reject the invitation to embark upon such an unwarranted and unwise intrusion into the administrative process.

Real parties in interest make two arguments we can summarily dismiss.  First, they assert that the Finance Committee's determination "whether or not" issuance of the bonds is necessary or desirable is subject to a substantial evidence standard of review, insisting

24

that the addition of the two words "or not" alters the calculus on the amount of discretion the Finance Committee wields and therefore the quantum of evidence needed to justify the exercise of that discretion. The argument is without merit. The term "whether" necessarily means "whether or not." Either way, the Finance Committee must decide if issuance is necessary or desirable, and the mere redundancy of the language does not thereby increase the scrutiny a court must give to that determination.

Second, real parties in interest suggest that to allow the Finance Committee utmost discretion in determining whether issuance is necessary or desirable is to allow it to operate as a mere "rubber stamp." Real parties in interest further contend that in that case there is no purpose for the Finance Committee and we should not assume the voters would engage in the idle act of creating a meaningless decision-making body. Their argument requires us to presume that the State Treasurer, the Director of the Department of Finance, the Controller, the Secretary of Business, Transportation and Housing, and the Chairperson of the Authority, all members of the Finance Committee with considerable public finance expertise, would shirk their responsibility to prudently control the timing of the authorization of the bonds. We do not agree that the creation of a Finance Committee with considerable discretion to employ its expertise would act as a mere rubber stamp. Rather, by enacting the Bond Act, the voters decided to mimic the same bifurcation of roles included in the Bond Law; that is, the voters intended to establish one body with expertise over managing the project and a second body with considerable public finance expertise to exercise its discretion over the timing and amount of the issuance of the bonds. Our deference to the Finance Committee's determination as to when the bonds are necessary or desirable does not render the voters' reliance on its expertise an idle act.

Real parties in interest insist that even if we reject their argument that the "necessary or desirable" finding was not supported by substantial evidence, we should not enter judgment validating the bonds because the Authority improperly requested the

25

Legislature to appropriate bond funds for a project that has morphed into something materially different from the project approved by the voters. Real parties in interest ask us to remand the validation to the trial court to make this determination. Their challenges are premature.

It is true that a bond act approved by the voters can, by its terms, limit the purposes for which the bond proceeds can be spent. (*O'Farrell v. County of Sonoma* (1922) 189 Cal. 343, 348-349 (*O'Farrell*).) "Whether the limitation be deemed to be contractual [citation] or of a status analogous to such relation [citation] or a restriction implied by the requirement of popular approval of the bonds [citation], it does restrict the power of the public body in the expenditure of the bond issue proceeds, and hence in the nature of the project to be completed and paid for." (*Mills v. S.F. Bay Area Rapid Transit Dist.* (1968) 261 Cal.App.2d 666, 668 (*Mills*).) More importantly, article XVI, section 1 of the California Constitution requires that the works funded by a bond measure shall be "distinctly specified" in the measure presented to the voters, and that any bonds to be issued as authorized by the bond act approved by the voters "shall be applied only to the specific object therein stated."

Real parties in interest acknowledge that there is no published appellate decision denying validation of a bond authorization before there has been an actual bond expenditure for a project differing significantly from the project approved by the voters.[6] There are, however, many cases in which the courts have broadly construed the purpose of the relevant bond act to allow projects to proceed that would appear to be either at

---

[6] The cases real parties in interest cite, as well as an opinion of the Attorney General, are inapposite because they did not involve challenges to mere authorizations of bond issuance solely for purposes authorized by the voters in the Bond Act. (*California Statewide Communities Development Authority v. All Persons Interested etc.* (2007) 40 Cal.4th 788, 795; *Morgan Hill Unified School Dist. v. Amoroso* (1988) 204 Cal.App.3d 1083, 1086-1087; 92 Ops.Cal.Atty.Gen. 1 (2009).) Nor do real parties in interest here raise any constitutional challenge to the authorization.

odds with, or beyond the scope of, the articulated purpose of the act or the description of the project on the ballot.

For example, in *East Bay Mun. Util. Dist. v. Sindelar* (1971) 16 Cal.App.3d 910 (*EBMUD*), the voters approved a measure allowing the utility district to incur a bonded indebtedness to finance a 10-year "Water Development Project for the East Bay Area" in 1958. (*Id.* at pp. 914-915.) By 1967 the construction of its physical components had been completed, with $84 million in authorized but unissued bonds remaining. The district celebrated the completion of the project. But in 1970 the board of directors authorized the issuance and sale of another $12 million in bonds based on its determination the bonds " 'were deemed necessary and desirable . . . to provide additional moneys to finance the Water Development Project for East Bay Area as authorized at . . . [the 1958 bond] . . . election.' " (*Id.* at pp. 915-916.) The district treasurer refused to sign the duly authorized bonds on the following grounds: " '1. That . . . [the district] . . . is without authority to issue said Bonds of Series G or any part thereof for the reason that the Water Development Project for East Bay Area has been fully constructed and completed and that no authority exists for the issuance of said bonds purely for the expansion of the water system of the District based upon the expanded area and increased water demand of the District since the date of . . . [the 1958 bond] . . . election, to wit, since June 3, 1958. 2. That it was generally understood by the electors of the District voting upon the proposition for the issuance of said bonds that the construction program would end within a period of ten years and that no additional bonds would be issued or sold more than ten years after the date of said election and that the authority to issue and sell said bonds accordingly expired on June 3, 1968, to wit, ten years from the date of said election. 3. That more than twelve years have elapsed since the date of said election and by reason solely of the lapse of time the authority granted by the electors for the issuance and sale of the bonds has ceased to have

27

any effect and the authority of the District to issue and sell said bonds has accordingly expired.' " (*Id*. at p. 917.)

The Court of Appeal issued a peremptory writ of mandate to compel the treasurer to execute the bonds. (*EBMUD*, *supra*, 16 Cal.App.3d at p. 920.) Despite the fact that the construction of the water system was complete and the language of the promotional materials for the ballot measure represented that the construction program would end within 10 years and no additional bonds would be issued or sold, the court found the bond proposition had been submitted to the voters "in broad and general terms." (*Id*. at p. 919.) Quoting the rationale of *Clark v. Los Angeles* (1911) 160 Cal. 317, 320, the court stated: " 'The purpose for which . . . [bond] . . . elections are required is to obtain the assent of the voters to a public debt, to the amount, and for the object, proposed. The amount must, of course, be stated on the ballot; the general purpose must be stated with sufficient certainty to inform the voters and not mislead them, as to the object intended; but the details of the proposed work or improvement need not be given at length in the ballot.' [Citation.] Thus, the language of the district's Ordinance No. 191, and of the ballot proposition which it addressed to the electorate, was sufficiently specific as to the object and purposes of the bonds proposed."

The courts have been particularly attuned to the fluidity of the planning process for large public works projects. In fact, the Supreme Court has allowed substantial deviation between the preliminary plans submitted to the voters and the eventual final project, admonishing: "[T]he authority to issue bonds is not so bound up with the preliminary plans as to sources of supply upon which the estimate is based that the proceeds of a valid issue of bonds cannot be used to carry out a modified plan if the change is deemed advantageous." (*Cullen v. Glendora Water Co.* (1896) 113 Cal. 503, 510.) Similarly, the court broadly construed the purpose of the proposition approving the Bay Area Rapid Transit District and sanctioned the relocation of one of the terminal stations. The court wrote, "Obviously, the statutes, the notice of election and the ballot

28

proposition itself contemplate a broad authority for construction of a three-county rapid transit system. In the wide scope of this substantial transit project, the deviation of 1 1/2 miles in location of a single station is but a minor change in the tentative plan which was relied upon only to forecast feasibility of the project as a whole." (*Mills*, *supra*, 261 Cal.App.2d at p. 669.)

The development of a high-speed rail system for the state of California is even more complex than a regional water or transportation system. The Authority is obligated to prepare preliminary and final funding plans as well as business plans every two years as it fine-tunes the construction of the project. Thus, it may be that the specifics of the project deviate from some of the preliminary planning documents or constitute minor changes from tentative plans. We cannot and should not decide whether any future use of bond funds will stray too far from the express language used in Proposition 1A to describe the purpose and parameters of the Bond Act. The pleadings and the trial court's rulings, in fact, were extremely limited in scope.

The complaint filed by the Authority and the Finance Committee was limited to the validity of the issuance of the bonds for any purpose authorized by the Bond Act, and as a consequence, it did not identify any particular use of the bond proceeds. Nor did the bond resolutions identify any particular use. Because there is no final funding plan and the design of the system remains in flux, as does the funding mechanism to support it, we simply cannot determine whether the project will comply with the specific requirements of the Bond Act and whether any future deviations will be considered significant or trivial.[7] To allow real parties in interest to prematurely challenge future potential uses of

---

[7] We reject the First Free Will Baptist Church's contention that Senate Bill No. 1029 and the revised business plan set forth the uses of the bond proceeds and those documents demonstrate that the high-speed rail system to be built is not the same project approved by the voters. Senate Bill No. 1029 expressly requires the Authority to prepare many more reports, approvals, and certifications, and the revised business plan is subject to

29

the bonds would undermine the purpose of the validation action and interpose an infinite number of obstacles to the public financing of public projects.

The Attorney General points out that whether or not any particular later expenditure of bond funds would comply with the Bond Act is not relevant to the validity of bond authorization and, as the cases cited by real parties in interest demonstrate, can be adjudicated in separate actions. (See, e.g., *Tooker v. San Francisco Bay Area Rapid Transit Dist.* (1972) 22 Cal.App.3d 643, 649, 652.) The trial court agreed. "Issues regarding the use of proceeds are separate from the issue raised in this validation action, which is whether the bonds were properly authorized." In denying requests for judicial notice of documents from the Tos action because they were irrelevant, the court recognized that the only statutes and documents it would consider in the validation action were those relating to bond authorization. The court ruled that "[t]he issue before the Court in this validation proceeding is strictly limited to whether the Finance Committee's determination that issuance of bonds was necessary and desirable as of March 18, 2013 is supported by any evidence in the record. . . . [¶] . . . [¶] Because this ruling disposes of the validation action, the Court finds it unnecessary to address or resolve any of the other arguments raised by the [real parties in interest] in opposition to the complaint." Thus, the trial court did not rule on the issue real parties in interest urge us to decide.

The validity of the authorization, therefore, is the only issue framed by the pleadings and decided by the trial court. The final funding plan and additional reports required by section 2704.08, subdivision (d) are yet to be prepared and approved by the Authority, let alone submitted to and approved by the Director of the Department of Finance. It is unclear, therefore, whether the final funding plan will recommend the expenditure of bond funds to "be applied only to the specific object" described in

biennial revision and updates. Moreover, the final funding plan has not been submitted. Simply put, it is too soon to determine how the Authority will specifically use the bond proceeds. At issue is authorization, not expenditure.

30

Proposition 1A. (Cal. Const., *supra*, art. XVI, § 1.) In other words, it is too soon to determine whether the project will be consistent with the parameters the voters approved.

Real party in interest Union Pacific Railroad Company urges us to expressly limit the scope of the validation judgment. We agree that an introductory paragraph describing the "Nature of the Action" in the validation complaint is at odds with the position the Authority has taken in its briefing submitted to this court and, together with a few overly broad phrases in one paragraph of the prayer, justifies Union Pacific's concerns that a judgment validating authorization might also validate future unlawful expenditures. The paragraph reads: "[Petitioners] further request a judgment declaring that all proceedings taken by [petitioners] in connection with the issuance and sale of the bonds, the commercial paper notes, and the refunding bonds are in conformity with the applicable provisions of all laws and enactments at any time in force or controlling upon such proceedings, whether imposed by constitution, statute, regulation, or otherwise; and that once declared valid, any challenges (including pending challenges) based on uses of proceeds of the bonds, commercial paper notes, or refunding bonds will not affect the determination of validity of the bonds, commercial paper notes, and refunding bonds, or the determination of validity of any contracts related to the issuance and sale of the bonds, commercial paper notes, or refunding bonds."

The prayer, for the most part, is more carefully crafted. Each of the following paragraphs limits the validation to the actual authorization and all the "conditions, things, and acts required by law to exist, happen, or be performed" *before* the authorization:

"[3.]a. All conditions, things, and acts required by law to exist, happen, or be performed precedent to the adoption of the Resolutions, and the terms and conditions thereof, including the authorization for the issuance and sale of the Bonds, Notes, and any Refunding Bonds, have existed, happened, and been performed in the time, form, and manner required by law.

31

"b. [Petitioners] are legally existing and have the authority under the law to cause the issuance and sale of the Bonds and Notes and to cause the issuance and sale of Refunding Bonds to refund Bonds, Notes, or Refunding Bonds previously issued, as authorized by the Bond Act and the Resolutions;  [¶] . . . [¶]

"d.  The Bonds, Notes, and Refunding Bonds to be issued pursuant to the Bond Act, when executed and delivered, will constitute valid and binding general obligations of the State, and any contracts related to the issuance and sale of the Bonds, Notes, or Refunding Bonds will constitute valid and binding obligations of the State, under the Constitution and laws of the State of California[.]"

Paragraph 3.c., however, gives rise to the same concern as the introductory paragraph.  The first part of paragraph 3.c. is consistent with the argument the Authority has advanced throughout these proceedings, and that is, the validation judgment does not determine the validity of future uses of the bond proceeds.  The innocuous language reads:  "All proceedings by and for [petitioners] in connection with the Bonds, Notes, and Refunding Bonds to be issued pursuant to the Bond Act, including the adoption of the Resolutions and the authorization of the Bonds, Notes, and any Refunding Bonds, were, are . . . ."  But then the language becomes susceptible to Union Pacific's charge that it is dangerously overbroad, with the potential to foreclose future challenges to unlawful uses of the bond proceeds.  The paragraph finishes as follows:  "and will be valid and binding, and were, are, and will be in conformity with the applicable provisions of all laws and enactments in force or controlling upon such proceedings, whether imposed by law, Constitution, statute, regulation, or otherwise[.]"

By contrast, paragraph 3.e. expressly limits the validation judgment to the authorization of the bonds and not to use of the proceeds.  Paragraph 3.e. states:  "Any challenges (including pending challenges) based on uses of proceeds of the Bonds, Notes, or Refunding Bonds will not affect the determination of validity of the Bonds, Notes, and any Refunding Bonds to be issued and sold, or the determination of validity of any

32

contracts related to the issuance and sale of the Bonds, Notes, or Refunding Bonds." Despite the plain language of paragraph 3.e., the overly broad language used in the last phrases of paragraph 3.c. gives rise to unnecessary ambiguity and potential mischief. To ensure there is no ambiguity, we will direct the trial court to delete this language as set forth in our disposition.

## II

## The Tos Action

Petitioners ask us to direct the trial court to vacate the peremptory writ of mandate commanding them to rescind the preliminary funding plan and to redo that plan. (§ 2704.08, subd. (c).) Although we agree with the Tos real parties that the voters clearly intended to place the Authority in a financial straitjacket by establishing a mandatory multistep process to ensure the financial viability of the project, we agree with petitioners that issuance of the writ violates very basic principles circumscribing when and against whom a writ of mandate may issue. In short, the Tos real parties' challenge to the preliminary funding plan was too late to have any practical effect, and it is too early to challenge a yet-to-be approved final funding plan as required by section 2704.08, subdivision (d).

### A.     *What are the guiding legal principles?*

Four simple words resolve the issues before us: clear, present, ministerial, and duty. The refrain is a familiar one. To obtain writ relief under Code of Civil Procedure section 1085, a petitioner must demonstrate that the respondent has a clear, present, and ministerial duty that inures to the petitioner's benefit. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 593 (*County of San Diego*); *Carrancho*, *supra*, 111 Cal.App.4th at pp. 1264-1265; *Agosto v. Board of Trustees of Grossmont-Cuyamaca Community College Dist.* (2010) 189 Cal.App.4th 330, 335-336; *Tomra Pacific, Inc. v. Chiang* (2011) 199 Cal.App.4th 463, 491.) From this general principle, several others follow. A writ is not available to enforce abstract rights (*Gardner v. Superior Court*

33

(2010) 185 Cal.App.4th 1003, 1008), to command futile acts with no practical benefits (*County of San Diego*, *supra*, 164 Cal.App.4th at pp. 595-596; *Associated Students of North Peralta Community College v. Board of Trustees* (1979) 92 Cal.App.3d 672, 680-681), or to intermeddle in the preliminary stages of an administrative planning process (*California Water Impact Network v. Newhall County Water Dist.* (2008) 161 Cal.App.4th 1464 (*C-WIN*).)  Nor will a writ lie if the respondent has an obligation to act under another law (*City of Fremont v. San Francisco Bay Area Rapid Transit Dist.* (1995) 34 Cal.App.4th 1780, 1790), the petitioner's rights are otherwise protected (*Duncan v. Superior Court* (1935) 3 Cal.2d 143, 145), or in the absence of prejudice (*Board of Supervisors v. Rechenmacher* (1951) 105 Cal.App.2d 39, 43; *In re C. T.* (2002) 100 Cal.App.4th 101, 111).  In other words, a writ of mandate must be necessary (*Duncan*, *supra*, 3 Cal.2d at p. 145); courts will not issue a useless or unenforceable writ (*County of San Diego*, *supra*, 164 Cal.App.4th at pp. 595-596).  A writ is not to be used to control the exercise of discretion, but to ensure that ministerial duties have been fulfilled.  (*California School Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 797.)

The Tos real parties insist that the Authority had a ministerial duty to prepare a preliminary funding plan that includes, identifies, or certifies each of the 11 components set forth in the statute.  (§ 2704.08, subd. (c)(2)(A)-(K).)  Where, as here, the purported duty is defined in a statute enacted by the people, a pure question of law is presented and well-worn principles of statutory construction guide our review.  (*California Chamber of Commerce v. Brown* (2011) 196 Cal.App.4th 233, 248-249.)  Statutory construction is an inherently judicial task and our review is de novo.  (*Carrancho*, *supra*, 111 Cal.App.4th at p. 1266.)  " 'Whether a particular statute is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts.' [Citation.]" (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 499.)

34

As pointed out by the Tos real parties, ascertaining the will of the electorate is paramount. (*County of Los Angeles v. State of California* (1987) 43 Cal.3d 46, 56.) Statutes adopted by the voters must be construed liberally in favor of the people's right to exercise their reserved powers, and it is the duty of the courts to jealously guard the right of the people by resolving doubts in favor of the use of those reserved powers. (*Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577, 596 (*Shaw*).) "The voters as well as the bondholders have an interest in the continued integrity of voter-ratified bond proposals." (*Veterans of Foreign Wars v. State of California* (1974) 36 Cal.App.3d 688, 692.) And, as the Tos real parties remind us, an administrative agency cannot change course after the electors have voted. (*O'Farrell*, *supra*, 189 Cal. 343, 344, 349.)

Yet the same basic rules of statutory construction apply to statutes enacted by the voters as to statutes passed by the Legislature. (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037.) We must look to the plain language of the statute to determine the intent of the electors (*Terminal Plaza Corp. v. City and County of San Francisco* (1986) 186 Cal.App.3d 814, 826); but the words of the statute are given their ordinary meaning in the context of the statute as a whole and in light of the entire statutory scheme (*Professional Engineers*, *supra*, 40 Cal.4th at p. 1037; *Doe v. Albany Unified School Dist.* (2010) 190 Cal.App.4th 668, 675-676).

The question posed is whether there was a clear and present ministerial duty imposed by the Bond Act on the Authority to redo the preliminary funding plan at the time the trial court issued the writ, given that the Legislature appropriated the funds despite the Authority's failure to submit a preliminary funding plan in compliance with the Bond Act.

**B.** **Is there a clear and present ministerial duty to redo the preliminary funding plan?**

The parties present opposing views about the intent of the voters and the scope of the duties they created under the Bond Act. The Attorney General argues the voters

35

approved the act to construct a high-speed rail system as quickly as possible to reduce traffic congestion and greenhouse gasses and to create jobs. (Stats. 2008, ch. 267, § 8.) While the Attorney General concedes the voters imposed more financial restraints on the Authority than in more typical infrastructure projects, she insists the duty to prepare a preliminary funding plan mandated by section 2704.08, subdivision (c) was for the exclusive benefit of the Legislature, not the voters or the bondholders. In her view, the preliminary funding plan informed the Legislature about the Authority's projections and progress and generated additional input from the peer review group and others. Thus, it achieved the purpose envisioned by the voters, and there is no language in the statute to evidence an additional intent to curtail the Legislature's prerogative to approve the appropriation in spite of a deficient preliminary funding plan.

The Tos real parties, on the other hand, discount the environmental and economic benefits the voters sought to achieve and emphasize the extraordinary duties the voters imposed on the Authority to substantiate the financial and environmental viability of the project *before* the bonds could be authorized, sold, and spent. The Tos real parties further contend the mandatory language of the statute was designed for the express benefit of the voters; that is, the voters insisted on an elaborate financial mechanism to ensure they would not be obligated to subsidize a boondoggle or pay for a stranded segment of the rail system. Because high-speed rail is the most expensive public infrastructure project in the state's history, the Tos real parties passionately argue that the voters were only willing to bear such an enormous cost by minimizing the risk, imposing a clear and nondiscretionary "High-Speed Passenger Train Financing Program" on the Authority, and mandating a number of other restrictive fiscal protections.

As a matter of statutory construction, there is merit to many of the Tos real parties' arguments. We give effect, as we must, to the plain language of article 2 as an indispensable part of the entire Bond Act. Article 2 is dedicated exclusively to the "High-Speed Passenger Train Financing Program." As described above, the Authority is

36

required to prepare and certify not one, but two, different funding plans.  The preliminary funding plan, at issue in these proceedings, must be prepared and submitted to the Legislature at least 90 days before the Authority requests the Legislature to appropriate bond funds.  (§ 2704.08, subd. (c).)  The preliminary funding plan also must be submitted to a peer review group, the Director of the Department of Finance, the policy committees with jurisdiction over transportation matters, and the fiscal committees in both houses of the Legislature.  (*Ibid*.)  The Authority did, in fact, submit its preliminary funding plan to each of the designated groups or committees, many of whom unabashedly registered their concerns and dissent.

The Tos real parties point to glaring deficiencies in the preliminary funding plan.  The trial court denied the Authority's motion for judgment on the pleadings on many of the Tos real parties' substantive claims raised in their complaint, which remain pending in the trial court, including a number of ways in which the Tos real parties assert the preliminary funding plan is deficient.  We denied the Authority's petition for a writ of mandate to compel the trial court to grant the motion for judgment on the pleadings, and as a result, those issues are proceeding to trial.  (*Cal. High-Speed Rail Authority v. Super. Ct.* (Apr. 15, 2014, C076042 [petn. den. by order].)  As described in our statement of facts, the writ proceeding before this court involves only two specific deficiencies:  (1) the Authority failed to identify all the sources for funding the initial usable segment of the project, and (2) it failed to complete all necessary project-level environmental clearances necessary to proceed to construction.

The language of section 2704.08, subdivisions (c)(2)(D) and (K) appears unambiguous and mandatory.  The duty to identify the sources of funding and to complete the environmental clearances is consistent with the very purpose of article 2; that is, the voters designed a financing program to ensure that construction of a segment would not begin until potential financial or environmental obstacles were cleared.

37

Nevertheless, mandate does not lie to vindicate abstract rights. Mandamus is steeped in practicality. For this reason, there must be a present duty for a writ of mandamus to issue. Here the question is not whether the Authority had a mandatory and ministerial duty to issue a preliminary funding plan compliant with section 2704.08, subdivisions (c)(2)(D) and (K) at the time the plan was approved and then submitted to the Legislature, for that critical time period has passed. Rather, the question is whether the Authority has a mandatory ministerial duty to rescind the plan and redo it *after* the Legislature appropriated the funds for issuance of the bonds approved by the voters. It is the intervening appropriation by the Legislature that presents an insurmountable hurdle for the Tos real parties. We explain this practical impediment in light of the whole statutory scheme.

The Bond Act compels the Authority to prepare a preliminary funding plan for submission to the Legislature and the Governor and a final funding plan for approval by the Director of the Department of Finance before committing any proceeds of bonds. The Tos real parties focus on the mandatory language indicating that the preliminary funding plan shall identify the sources of all the funding for the usable segment and shall certify that all environmental clearances have been obtained. But under the Bond Act, bond funds cannot be committed and spent until the second and final funding plan is approved by the Authority and submitted to the Director of the Department of Finance and the Chairperson of the Joint Legislative Budget Committee, *and* an independent financial consultant prepares a report. This latter report is particularly significant in that the independent consultant must certify that construction can be completed as proposed and is suitable for high-speed rail; the planned passenger train service will not require an operating subsidy; and upon completion, passenger service providers can begin using the tracks or stations. (§ 2704.08, subdivision (d).) As a result, the first funding plan, outlined in section 2704.08, subdivision (c), is indeed "preliminary" since commitments cannot be made and construction cannot begin until a second, final funding plan is

38

approved, an independent report attests to the financial integrity of the plan, the Joint Legislative Budget Committee reviews it, and the Director of the Department of Finance finds "the plan is likely to be successfully implemented." (§ 2704.08, subd. (d).)

Furthermore, the Legislature attached conditions to its appropriation of over $8 billion to finance high-speed rail. As to the $1.1 billion appropriation for "Bookend" funding, the Legislature restricted the encumbrance of the funds to ensure the final funding plan was compliant with the Bond Act and all the necessary environmental clearances had been obtained. As enacted, Senate Bill No. 1029 provides:

"5. No funds appropriated in this item shall be encumbered prior to the High-Speed Rail Authority submitting a detailed funding plan for the project or projects in accordance with subdivision (d) of Section 2704.08 of the Streets and Highways Code to (a) the Department of Finance, (b) the Chairperson of the Joint Legislative Budget Committee, and (c) the peer review group established pursuant to Section 185035 of the Public Utilities Code.

"6. No funds appropriated in this item shall be encumbered for construction of a project prior to completion of all project-level environmental clearances necessary to proceed to construction and the final notices being contained in the funding plan for the project.

"7. Prior to the obligation of funds to any specific project, and subject to the approval of the Department of Finance, the High-Speed Rail Authority Board shall develop an accountability plan, consistent with Executive Order S-02-07, to establish criteria and procedures to govern the expenditure of the bond funds in this appropriation, and the outcomes that such expenditures are intended to achieve, including a detailed project description and project cost. The procedures shall ensure that the investments comply with requirements of applicable state and federal laws, and are consistent with and advance the state high-speed train system. . . ." (Stats. 2012, ch. 152, § 3, provisions 5-7, approved by Governor July 18, 2012.)

39

This multilayer approval process is reminiscent of the statutory scenario in *C-WIN*, *supra*, 161 Cal.App.4th 1464. Before the developer could begin construction of a large industrial/business park in the city of Santa Clarita (City), two reports were necessary: a water supply assessment (WSA) and an environmental impact report (EIR).[8] (*Id*. at pp. 1471-1472.) The California Water Impact Network (C-WIN) sought a writ of mandate to set aside the WSA prepared by the water district at the request of the City before the EIR had been approved and certified. (*Id*. at p. 1471.) C-WIN argued it was entitled to directly challenge the WSA because it was a final determination by the water supplier concerning the sufficiency of the water supply for a proposed project. (*Ibid*.) The Court of Appeal disagreed. (*Ibid*.)

Pursuant to the so-called "WSA law" (Wat. Code, §§ 10910-10915), the water supplier most likely to serve the project must, at the request of the lead agency under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), prepare the WSA. (*C-WIN*, *supra*, 161 Cal.App.4th at pp. 1478-1480.) The Water Code specifically mandates what information the WSA must include, and like the Tos real parties here, C-WIN asserted the assessment was fatally deficient because it did not satisfy the statutory requirements and was therefore subject to attack under either administrative or traditional mandamus. (*C-WIN*, at pp. 1480, 1483-1484.) The Court of Appeal held that the petition failed to satisfy prerequisites common to both forms of mandamus relief. (*Id*. at p. 1484.) In short, the WSA was not a final determination, finding, or decision as necessary to obtain relief by mandamus of either variety. (*Id*. at p. 1485.)

The court explained: "Thus, in our view the WSA is . . . a technical, informational advisory opinion of the water provider. Though the WSA is required by statute to

---

[8] The WSA would become a part of the EIR.

40

include an assessment of certain statutorily identified water supply issues and is required to be included in the EIR, the WSA's role in the EIR process is akin to that of other informational opinions provided by other entities concerning potential environmental impacts–such as traffic, population density or air quality.  The fact that the duties of the water provider in preparing the WSA and responsibility of the lead agency in requesting the WSA are committed to statute does not change the fundamental nature of the WSA itself as an advisory and informational document." (*C-WIN*, *supra*, 161 Cal.App.4th at p. 1486.)

In determining the propriety of mandamus relief, the Bond Act bears considerable similarity to the Water Code and CEQA provisions at issue in *C-WIN*.  The preliminary funding plan submitted to the Legislature, like the WSA, "is but an interlocutory and preliminary step in [a multistep] process, and in general, interim determinations are not subject to mandamus review." (*C-WIN*, *supra*, 161 Cal.App.4th at p. 1486.)  In *C-WIN*, the court concluded that the lead agency, and not the water supplier, made the final determination for mandamus purposes about the sufficiency of the water supply.  (*Ibid*.)  The WSA must be incorporated into the final EIR, and the lead agency is not required to accept the WSA's conclusions.  (*Id*. at p. 1487.)  "The power to 'evaluate' the WSA necessarily invests the lead agency with the authority to consider, assess and examine the quality of the information in the WSA and endows the lead agency with the right to pass judgment upon the WSA." (*Ibid*.)

Similarly, the preliminary funding plan plays an equally interlocutory and advisory role midstream in the approval process.  The Authority must submit the plan to a number of groups, committees, and agencies, including the Legislature, but bond proceeds cannot be committed and construction cannot begin until the final funding plan is sent to the Joint Legislative Budget Committee and approved by the Director of the Department of Finance.  And as pointed out above, the Director of the Department of Finance must simultaneously review a report prepared by an independent financial

41

consultant. Thus, the Tos real parties would have us intermeddle in the fluid intermediary steps involved in studying the financial viability of high-speed rail in California.

We concede there are differences between the WSA law and the Bond Act, including the very different roles of the lead agency from the roles of the Legislature and, ultimately, the Director of the Department of Finance. But those differences do not diminish or detract from the basic principle that mandamus must be used only to review a final determination, and a writ can issue only if there is a present statutory duty to act. Here, the preliminary funding plan under attack, like the WSA, helped an intermediate body make an informed decision. But it is the second and final funding plan, like the final EIR, that will provide the ultimate decision maker with the most important and expansive information necessary to make the final determination whether the high-speed rail project is financially viable. The Authority now has a clear, present, and mandatory duty to include or certify to all the information required in subdivision (d) of section 2704.08 in its final funding plan and, together with the report of the independent financial consultant, to provide the Director of the Department of Finance with the assurances the voters intended that the high-speed rail system can and will be completed as provided in the Bond Act. The Legislature appropriated the bond proceeds based on the preliminary funding plan, however deficient, and there is no present duty to redo the plan. The writ therefore should not have been issued.

C.    *Did the trial court err by refusing to issue a writ compelling rescission of the legislative appropriation?*

The Tos real parties have been tepid in challenging the Legislature's appropriation and for a very good reason. Judicial intrusion into legislative appropriations risks violating the separation of powers doctrine. " '[T]he entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by

necessary implication denied to it by the Constitution. . . . [A]ll intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action." ' " (*Shaw*, *supra*, 175 Cal.App.4th at p. 595.)

The trial court found that the Tos real parties did not challenge the legislative appropriation until filing a reply brief, and on that basis alone, the trial court rejected the argument. The court, however, also rejected the Tos real parties' argument on substantive grounds. The court explained: "Nothing in Section 2704.08 (c)(2), or elsewhere in Proposition 1A, provides that the Legislature shall not or may not make an appropriation for the high-speed rail program if the initial funding plan required by Section 2704.08 (c)(2) fails to comply with all the requirements of the statute. Lacking such a consequence for the Authority's non-compliance, Proposition 1A appears to entrust the question of whether to make an appropriation based on the funding plan to the Legislature's collective judgment. The terms of Proposition 1A itself give the Court no authority to interfere with that exercise of judgment."

Urging us to reverse the trial court's ruling, the Tos real parties argue that the Legislature cannot appropriate funds for high-speed rail when the preliminary funding plan it considered did not comply with the Bond Act. We disagree. "[L]egislative restraint imposed through judicial interpretation of less than unequivocal language would inevitably lead to inappropriate judicial interference with the prerogatives of a coordinate branch of government. Accordingly, the only judicial standard commensurate with the separation of powers doctrine is one of strict construction to ensure that restrictions on the Legislature are in fact imposed by the people rather than by the courts in the guise of interpretation." (*Schabarum v. California Legislature* (1998) 60 Cal.App.4th 1205, 1218 (*Schabarum*).) We return, as we must, to the plain language of the statute. As the trial court aptly noted, there is nothing in the statute compelling the Legislature to ensure that the preliminary funding plan was compliant; nothing in the statute defining any

43

ministerial duties the Legislature was obliged to perform; and there is nothing in the statute describing any consequences to the Authority for failing to produce a preliminary funding plan certifying that each of the 11 components have been included.

We agree with the trial court that the Bond Act provides no basis for allowing the judiciary to interfere with the collective judgment of the Legislature in approving the issuance of bonds even if the funding plan it considered did not meet the letter of the law. Rather, the legislative judgment to move forward with the project before all funding sources were identified and all environmental clearances were obtained involves the type of decision making peculiar to the discretionary power of a legislative body. " 'Mandate will not issue to compel action unless it is shown the duty to do the thing asked for is plain and *unmixed with discretionary power or the exercise of judgment*. [Citation.]' " (*County of San Diego*, *supra*, 164 Cal.App.4th at p. 596.)

We accept the Tos real parties' argument, as we expressed in *Shaw*, that courts have the power to invalidate an unconstitutional legislative appropriation. (*Shaw*, *supra*, 175 Cal.App.4th at p. 596.) But in *Shaw*, the voters made clear what the Legislature could and could not do. The approved ballot measure expressly stated the Legislature could amend the statute only if the amendment was consistent with, and furthered the purpose of, the section. (*Id*. at p. 597.) Here the Bond Act does not curtail the exercise of the Legislature's plenary authority to appropriate. The fact that the Bond Act requires the Authority to prepare a preliminary funding plan and to present it to the Legislature before an appropriation is made does not evidence an intent to prevent the Legislature from acting if the preliminary funding plan is not perfectly compliant with the Bond Act.

Beyond the plain language of the Bond Act, we are obliged to respect the separate constitutional role of the Legislature. (Cal. Const., art. III, § 3; *Butt v. State of California* (1992) 4 Cal.4th 668, 695.) "Respect for the Legislature's constitutional role demands that the courts refuse to judge the wisdom of legislation or the motives of the legislators." (*Schabarum*, *supra*, 60 Cal.App.4th at p. 1219.) In particular, the separation-of-powers

44

principles limit judicial authority over appropriations. (*Newton-Enloe v. Horton* (2011) 193 Cal.App.4th 1480, 1491.) Thus, in deference to a coordinate branch of government and in the absence of a clear directive from the people to constrain the discretion of the Legislature, we will not circumscribe legislative action or intrude on the Legislature's inherent right to appropriate the funding for high-speed rail. The trial court properly refused to issue a writ dictating if, or how, the Legislature should act in the face of a deficient preliminary funding plan. We too must defer to the legislative prerogative to control appropriations.

In sum, we conclude as follows: 1) as a matter of statutory construction, the voters intended to impose mandatory financial restraints on the Authority, including the duty to prepare two funding plans, each of which included specific criteria outlined in section 2704.08, subdivisions (c) and (d), respectively; 2) applying well-established principles restraining the issuance of writs of mandamus, the trial court erred by compelling the Authority to rescind the preliminary funding plan when there had been no final determination, finding, or decision and a second and final funding plan will be forthcoming; there was no present duty to redo an informational, interlocutory plan after the Legislature had authorized the issuance of the bonds; and to require such an idle act would merely vindicate an abstract right with no practical effect; and 3) applying the inviolate constitutional restraint imposed on the judiciary by the separation of powers doctrine, we cannot dictate to the Legislature how it should utilize a deficient preliminary funding plan.

## D.     *Additional arguments.*

The Tos real parties and amici curiae raise a number of additional arguments that are without merit. Echoing the trial court's creative reasoning, the Tos real parties attempt to make the efficacy of the final funding plan contingent on the preliminary funding plan. In other words, the argument goes, the Authority cannot meet its mandatory ministerial duty to approve a final funding plan as required by

45

section 2704.08, subdivision (d) if it does not generate a statutorily compliant section 2704.08, subdivision (c) funding plan. The trial court expressed its concern that the Authority could begin construction of high-speed rail in the absence of the necessary environmental clearances because subdivision (d), unlike subdivision (c), did not require the Authority to certify that the environmental clearances had been obtained. As a result, the trial court concluded the project could evade environmental review once the Legislature overlooked the deficiency and approved the sale of the bonds. Not so.

Once again, we begin with a careful examination of the language of the statute. Simply put, the Bond Act does not require a fully compliant preliminary funding plan before a final plan may be approved. There is nothing in the statute connecting the two plans. Moreover, it is reasonable to infer, as the Attorney General suggests, that the two plans serve very different purposes–the preliminary plan to inform the Legislature of the progress made before it authorizes the issuance of bonds, and the final plan to ensure the financial integrity of the project before proceeds of the bonds are committed.

Second, a writ of mandate does not lie if the public agency has an obligation to perform under another law. (*City of Fremont*, *supra*, 34 Cal.App.4th at p. 1790.) The Authority has repeated frequently that it will have all the requisite environmental clearances before construction begins. CEQA certainly demands nothing less. The Tos real parties, in fact, concede that state and federal law require environmental clearance before starting construction. Because the Authority must comply with CEQA before the project proceeds, a writ of mandate is not necessary.

Third, the Legislature forewarned the Authority to complete all the project-level environmental clearances. Indeed, as to the appropriation to finance improvements to the "Bookends," "[n]o funds appropriated in this item shall be encumbered for construction of a project prior to completion of all project-level environmental clearances necessary to proceed to construction and the final notices being contained in the funding plan for the project." (Stats. 2012, ch. 152, § 3, provision 6.) The Legislature thereby compelled the

46

Authority to complete its responsibility to obtain the environmental clearances it had not obtained at the time it drafted its preliminary funding plan before it could encumber the appropriated bond funds. In effect, the Legislature simply gave the Authority an extension of time to complete its section 2704.08, subdivision (c)(2)(K) duty and assured it would be able to certify to the environmental clearances within the section 2704.08, subdivision (d) final funding plan.

Finally, section 2704.08, subdivision (d) requires a report describing any material changes from the section 2704.08, subdivision (c) preliminary funding plan. Given that CEQA requires the environmental clearances described in subdivision (d), the report undoubtedly will describe how and when the clearances were obtained in the period of time between the approval of the preliminary and final funding plans. In addition, the independent financial consultant must indicate that the construction "can be completed as proposed." (§ 2704.08, subd. (d).) The construction cannot be completed if the environmental clearances have not been obtained. The environmental clearance provision does not render the two funding plans interdependent, and in the absence of the writ issued by the trial court, the project will not evade environmental review.

The Kings County Water District contends it was prejudiced by petitioners' unreasonable two-month delay in filing the writ petition after entry of the ruling, and therefore, their petition is barred by laches and estoppel. The water district points out that the court did not sign the order until January 3, 2014, and it was not served on them until January 16, just eight days before petitioners filed their petition, originally before the Supreme Court. Their delay was not unreasonable, and the water district fails to demonstrate how it suffered prejudice. Nor is there any merit in the water district's claim that federal preemption is involved in either the Tos action or the validation action. The estoppel claim is utterly without merit.

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to 1) vacate its order of November 25, 2013, and the peremptory writ of mandate issued thereon requiring the Authority to rescind and reissue its preliminary funding plan under Streets and Highways Code section 2704.08, subdivision (c), and 2) enter judgment on the complaint for validation filed by the Authority and the Finance Committee, as follows:

1. All conditions, things, and acts required by law to exist, happen, or be performed precedent to the adoption of the resolutions, and the terms and conditions thereof, including the authorization for the issuance and sale of the bonds, notes, and any refunding bonds, have existed, happened, and been performed in the time, form, and manner required by law.

2. Petitioners are legally existing and have the authority under the law to cause the issuance and sale of the bonds and notes and to cause the issuance and sale of refunding bonds to refund bonds, notes, or refunding bonds previously issued, as authorized by the Bond Act and the resolutions.

3. All proceedings by and for petitioners in connection with the bonds, notes, and refunding bonds to be issued pursuant to the Bond Act, including the adoption of the resolutions and the authorization of the bonds, notes, and any refunding bonds, were and are valid and binding.

4. The bonds, notes, and refunding bonds to be issued pursuant to the Bond Act, when executed and delivered, will constitute valid and binding general obligations of the state, and any contracts related to the issuance and sale of the bonds, notes, or refunding bonds will constitute valid and binding obligations of the state, under the Constitution and laws of the state of California.

5. Any challenges (including pending challenges) based on uses of proceeds of the bonds, notes, or refunding bonds will not affect the determination of validity of the bonds, notes, and any refunding bonds to be issued and sold, or the determination of the

48

validity of any contracts related to the issuance and sale of the bonds, notes, or refunding bonds.

The stay previously ordered is vacated upon finality of this decision.  The parties shall share costs in this original proceeding.  (Cal. Rules of Court, rule 8.493(a), (b).)


                                                             _____RAYE_____, P. J.


We concur:


_____ROBIE_____, J.


_____BUTZ_____, J.